319 P.3d 252

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Kevin Alexander SCOTT, Petitioner/Defendant–Appellant.

No. SCWC–10–0000037.

Supreme Court of Hawai'i.

Oct. 16, 2013.

Kevin O'Grady, Honolulu, for petitioner.

Linda L. Walton, Kealakekua, for respondent.

RECKTENWALD, C.J., NAKAYAMA, McKENNA, and POLLACK, JJ., with ACOBA, J., concurring separately.

Opinion of the Court by POLLACK, J.

Petitioner/Defendant–Appellant Kevin Alexander Scott (Scott) seeks review of the January 15, 2013 Judgment on Appeal of the Intermediate Court of Appeals (ICA), filed pursuant to its December 17, 2012 Summary Disposition Order, affirming the Judgment of Conviction and Sentence (Judgment) entered by the Circuit Court of the Third Circuit (circuit court) on August 30, 2010.

Scott's appeal arises from the circuit court's denial of his request for the written transcripts or the DVD video recordings of his codefendant's trial. For the reasons set

forth herein, we hold that Scott demonstrated that the requested transcripts or DVD video recordings were necessary for an effective defense, where the charges against Scott and his codefendant arose from the same incident and involved identical facts, and the same key witness testified against both Scott and his codefendant at their respective trials. Thus, the circuit court erred by denying Scott's request. Accordingly, we vacate the ICA's Judgment on Appeal and the circuit court's Judgment, and remand for a new trial consistent with this opinion.

I.

A.

The charges against Scott arose out of an incident that occurred on October 18, 2009 and involved Scott, his brother Jefferson Scott (Jefferson), and the complainants Leif Martin (Leif) and Kerry Martin (Kerry). Scott and Jefferson were indicted separately by the State of Hawaiʻi (State) upon multiple charges related to the incident.

Jefferson was indicted first, upon charges of assault in the second degree,[1] assault in the third degree,[2] and terroristic threatening in the second degree.[3] *State v. Scott*, No. 30499, 125 Hawaiʻi 30, 2011 WL 1878851 (Haw.App. May 12, 2011) (SDO). Following a jury trial, on April 14, 2010, Jefferson was convicted of two counts of assault in the third degree and one count of terroristic threatening in the second degree.[4] *Id.* at *1.

On January 25, 2010, Scott was indicted by a grand jury upon one count of assault in the second degree for intentionally or knowingly

---

1. Hawaiʻi Revised Statutes (HRS) § 707–711(1)(a) (Supp. 2009) provides in relevant part:

   (1) A person commits the offense of assault in the second degree if:
     (a) The person intentionally or knowingly causes substantial bodily injury to another[.]

2. HRS § 707–712 (1993) provides in relevant part:

   (1) A person commits the offense of assault in the third degree if the person:
     (a) Intentionally, knowingly, or recklessly causes bodily injury to another person[.]

3. HRS § 707–715 (1993) provides in relevant part:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
   (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]
HRS § 707–717(1) (1993) provides that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716."

4. The Honorable Ronald Ibarra presided. *Id.* at *1 n. 1.

causing substantial bodily injury to Leif[5]; two counts of terroristic threatening in the first degree, for threatening to cause bodily injury to Leif and Kerry with the use of a dangerous instrument; and one count of terroristic threatening in the first degree by common scheme.[6] A jury trial was scheduled for June 29, 2010.[7]

On February 17, 2010, the State filed a "Notice of Liability for Conduct of Another" (Notice of Liability), stating that it intended to use evidence that Scott "aided his brother, Jefferson Scott, in committing the crimes charged in this case," pursuant to HRS §§ 702-221(1) and (2)(c)[8], 702-222(1)(b)[9], and 702-223[10]. The Notice provided that the State intended to introduce evidence that Jefferson "assisted" Scott after Scott "got into a dispute with" Leif and Kerry:

> Specifically, the State will introduce evidence that JEFFERSON SCOTT assisted the defendant after the defendant got into a dispute with the defendant's neighbors, LEIF MARTIN and KERRY MARTIN. During what started as a verbal argument between defendant and the Martins, JEFFERSON JOSEPH SCOTT became angry and decided to assist his brother. Defendant's brother, JEFFERSON SCOTT, then punched LEIF MARTIN, who fell to the ground unconscious....
>
> [T]he defendant's brother then kicked LEIF MARTIN in the head while he was on the ground, unconscious, as the defendant, KEVIN SCOTT, continued to threaten.

(Emphases added).

On June 15, 2010, Scott filed a Motion to Continue Trial with the circuit court, pursuant to Rule 12 of the Hawai'i Rules of Penal Procedure (HRPP) and Rule 7 of the Hawai'i Circuit Court Rules.[11] The motion provided that defense counsel needed additional time to "obtain copies of the recent trial of the co-defendant brother in order to adequately prepare a defense in the instant case." In defense counsel's declaration in support of the motion, counsel explained that the transcripts had not been previously ordered because Scott had authorized him to enter into plea negotiations with the State. Defense counsel believed "the case was headed in the direction of a plea agreement" based on the State's plea offer in April 2010. Defense counsel therefore did not order Jefferson's trial transcripts in an effort to avoid incurring unnecessary expenses. However, "the plea agreement reached by the parties ... fell out of orbit based on ... newly discovered information[.]" Counsel additionally stated that he had mistakenly assumed another trial scheduled at approximately the same time as Scott's trial was "first up and was certain to go[.]" Finally, defense counsel represented to the court that he had ex-

---

5. HRS § 707-711(1)(a).

6. HRS § 707-716(1) (Supp. 2009) provides in relevant part:

   (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

   ....

   (b) By threats made in a common scheme against different persons;

   ....

   (e) With the use of a dangerous instrument.

7. The Honorable Elizabeth A. Strance presided.

8. HRS § 702-221 (1993) provides in relevant part:

   (1) A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

   (2) A person is legally accountable for the conduct of another person when:

   ....

   (c) He is an accomplice of such other person in the commission of the offense.

9. HRS § 702-222 (1993) provides in relevant part:

   A person is an accomplice of another person in the commission of an offense if:

   (1) With the intention of promoting or facilitating the commission of the offense, the person:

   ....

   (b) Aids or agrees or attempts to aid the other person in planning or committing it[.]

10. HRS § 702-223 (1993) provides:

    When causing a particular result is an element of an offense, an accomplice in the conduct causing the result is an accomplice in the commission of that offense, if the accomplice acts, with respect to that result, with the state of mind that is sufficient for the commission of the offense.

11. The record indicates that this was Scott's first request for a continuance of trial in this case.

plained the need for the transcripts to Scott and Scott had agreed "to waive his Rule 48 and constitutional speedy trial rights" in order for the court to consider continuing the trial.

At about the same time that the Motion to Continue Trial was filed, defense counsel also submitted a "Request Form for Non Appeal Cases" (Request Form I) to the administrative judge for the Third Circuit (administrative judge).[12] Defense counsel requested the written transcripts of Jefferson's jury trial proceedings, a pretrial motion hearing, and sentencing hearing.

On June 21, 2010, the State filed a "Supplement to Response to Motion to Continue Trial"[13] (Supplemental Response) with the circuit court, contending that Scott had "made no showing that he requested the transcripts of his brother's trial, or that they are necessary for his defense." The State also argued that Scott had access to the transcripts of the grand jury proceedings and a protective order hearing at which Scott and Jefferson testified. The State further asserted that Jefferson's "entire trial was recorded on DVD, which will require less than a day for the defendant to copy" and which fulfilled the "same function as a transcript."

Apparently in response to the Supplemental Response, defense counsel submitted a second "Request Form for Non Appeal Cases" (Request Form II) to the administrative judge. Defense counsel requested the video recordings of the same proceedings related to Jefferson's trial that he had requested written transcripts for in Request Form I.

A hearing on the Motion to Continue Trial was held on June 23, 2010. Following the hearing, the circuit court denied the motion.[14] The record does not include a transcript of the hearing or an order from the circuit court regarding its disposition of the motion. The June 23, 2010 court minutes indicate that the circuit court denied Scott's Motion to Continue Trial because "the information being sought could have been more specific and not be a vague allegation of what might be out there." The court also reasoned that it had summoned a jury and the parties had indicated they were ready to proceed with trial. Finally, the court stated that "if there was a need for expedited transcripts, motions could have been filed," and Scott had not demonstrated prejudice.

On June 24, 2010, consistent with the circuit court's decision to deny Scott's Motion to Continue Trial, the administrative judge denied Request Form I and Request Form II. Both forms were stamped "Disapproved and So Ordered." On Request Form I, the judge initialed the following handwritten statement next to his signature: "Counsel is appointed in another case. Defendant does NOT HAVE a constitutional right to a 'free' audio in this case." (Underline emphasis added). Similarly on Request Form II, the judge initialed the following handwritten statement: "Counsel is appointed in another case. Defendant does not have a constitutional right to a 'free' video in this case." (Emphasis added). Both Request Forms I and II were filed on June 29, 2010.

### B.

Scott's jury trial commenced on June 29, 2010 and adduced the following evidence.

On October 18, 2009, Scott went to visit Jefferson at the latter's home. Jefferson's home was located in a cul-de-sac, next door to Kerry's home. Scott parked his van on the street.

That night, Leif was visiting Kerry and their children at Kerry's home. Leif and Kerry were married but separated. Leif was employed as a federal security officer for the Transportation Security Administration at

---

12. Request Form I was submitted to the Honorable Ronald Ibarra for approval. Although there was no time stamp to indicate when the document was received by the administrative judge, defense counsel's signature on the form is dated June 15, 2010.

13. Although the State's Supplemental Response suggests that an initial response to Scott's Motion to Continue Trial had been previously filed, such a response was not included in the record on appeal.

14. Judge Strance presided over the Motion to Continue Trial hearing.

the airport. When Leif arrived at Kerry's home, he double-parked his car next to Scott's van, so that his car was closer than three feet from the van. There was apparently a history of problems between the Martins and the Scotts regarding the van being parked in the cul-de-sac.

Later that night, Leif and Kerry came outside to the driveway area of Kerry's home and began "venting" to one another about the van being parked in the cul-de-sac. According to Scott, he and Jefferson were sitting on the porch when he heard Leif yelling about the van being parked, prompting him to walk out to where Leif and Kerry were standing. Kerry and Leif testified that as Scott approached them, Scott stated, "If you wanted me to move it, why didn't you just say so." Kerry responded that she was "really over this drama" and Leif commented that Scott had previously dented Kerry's father's car. Scott approached Kerry and responded, "I talked to that old man about that." While Kerry took a step back, Leif took a step towards Scott. Scott and Leif then stood "face-to-face," arguing about the van being parked in the cul-de-sac.

While Scott and Leif were arguing, Jefferson came outside and asked what was happening. Leif and Jefferson had an exchange regarding the van. Scott testified that Leif walked towards Jefferson aggressively "with his fists clenched," and when Leif got to within arm's reach of Jefferson, Jefferson hit Leif on his chin and "knocked him out," causing Leif to fall backwards and hit the ground. Kerry similarly testified that while Scott and Leif were arguing, Jefferson "came from behind [Scott] and punched Leif in the side of the head." According to Kerry, Leif then fell unconscious for one and a half to three minutes.

Leif could not recall much of the incident after Jefferson came outside. Leif only remembered Jefferson coming around the car towards him, and then being in the ambulance.

Scott testified that after Jefferson punched Leif, he went to his van to retrieve his cell phone so that he could call an ambulance. Kerry testified that as she tried to wake Leif, Jefferson was "being really erratic," "bouncing around" near Leif's feet while yelling threats at her and Leif. She heard a car door slam, and when she looked over she saw Scott "coming from around the far side of his van" while putting "something shiny" into his waistband. Kerry turned back and saw Jefferson kick Leif in his upper body. Scott testified that as he was returning from his van, he saw Jefferson kick the left side of Leif's face. Scott ran over and told Jefferson to stop hitting Leif, and told Kerry that she and Leif needed to leave. However, Kerry was unable to lift Leif on her own.

At this point, Scott and Kerry's version of the events substantially diverge.

According to Kerry, Scott helped her lift Leif, leaned Leif against her, and then stepped back. Jefferson was "still jumping around a lot," "just acting ... really kinda crazy." Leif was "just barely conscious" and Kerry tried unsuccessfully to "drag him." As she was telling Leif, "We need to go," Scott came up along her right side, pulled out a "small pistol-style gun" from his waistband, and placed it "flat against the side of Leif's face." Scott told them to get into their house, then pointed the barrel of the gun at the side of Leif's temple and threatened him. Then as Kerry continued to hold Leif up, Scott "hit Leif in the side of the head with the butt of the gun." Leif went unconscious again, and Kerry lowered him to the ground. When she looked back up, Scott was standing over her, pointing the gun at her while threatening her and yelling at her to get in the house. After trying unsuccessfully to get Leif into his car, Kerry ran into the house and called 911. Kerry testified that the entire altercation lasted about fifteen minutes.

According to Scott, he put his cell phone in his pocket, raised Leif to his feet, and then helped Kerry move Leif towards the driveway. As they were walking, Scott could feel Leif "beginning to get some feet underneath him again," and tried to get Kerry to take Leif. However, Kerry pushed Leif back onto Scott and "had words" with Jefferson while Scott continued to hold Leif from behind and attempt to walk him towards his driveway. Leif "began to come to" and tried to turn to see who was helping him; when he realized

that it was Scott, he broke free and appeared to regain his composure. Scott took his cell phone out of his pocket and told Leif to get back into the car. When Leif approached Scott aggressively and got to "about half an arm's length" from Scott, Scott testified, "I gave him a right hook and I hit him in his eye, and he fell down." Scott's cell phone, which he was holding in his left hand, flew onto the ground. Scott then got into his van and locked the door.

## C.

Scott was convicted of assault in the second degree (Count I), the lesser included offense of terroristic threatening in the second degree as to Leif (Count II), and terroristic threatening in the first degree as to both Leif and Kerry (Count IV).[15]

On August 30, 2010, the circuit court sentenced Scott to an indeterminate term of imprisonment of five years in Count I, one year of imprisonment in Count II, and an indeterminate term of five years imprisonment in Count IV, with all terms to run concurrently.[16]

## II.

On appeal to the ICA, Scott argued in relevant part that the "trial court erred when it refused to provide" his court-appointed counsel with the requested "transcripts of testimony of the complaining witness and another state witness," thereby depriving him of his right to a fair trial and his right to mount an effective defense. Scott argued in support of this point that Jefferson's trial involved the same victims, Leif and Kerry, and the same primary witness, Kerry. Without the transcripts of Jefferson's trial proceedings, defense counsel was unable to adequately prepare to cross-examine these witnesses during Scott's trial. Furthermore, Scott contended

that he was not provided an adequate substitute for the requested transcripts, as even his request for a DVD video recording of the relevant proceedings was denied.

The State responded that the administrative judge did not err in denying Scott's request for transcripts because Scott did not make the requisite showing of necessity. The State also argued that Scott did not adequately preserve this point of error on appeal because the administrative judge's denial of Scott's Request Form was a denial of a pro forma transcript request form and not a denial of a formal motion explaining the necessity of having the transcripts, and Scott further failed to file a motion to reconsider the judge's decision. Additionally, the State contended that Scott did not file a motion to obtain the transcripts of Jefferson's trial proceedings with the circuit court judge.

The ICA affirmed Scott's conviction. *State v. Scott,* No. CAAP–10–0000037, 128 Hawai'i 478, 2012 WL 6568233 (Haw.App. Dec. 17, 2012) (SDO). The ICA reasoned that Scott's Request Form I[17] did not provide any reason for the request or indicate, on its face, any reason that the transcripts were "necessary for an adequate defense" in Scott's case. *Id.* at *1. The ICA further found that Scott had not claimed that "all of the seven transcripts requested contain the testimony of witnesses he anticipated would testify in his trial." *Id.*

The ICA stated that Scott had failed to cite any authority to support his contention that he was entitled to transcripts of proceedings in another case. *Id.* The ICA differentiated this case factually from *State v. Mundon,* 121 Hawai'i 339, 219 P.3d 1126 (2009) and *Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), in which the courts held that an indigent criminal defendant is entitled to transcripts of prior proceedings in the defendant's own case when such transcripts are necessary for

---

**15.** The jury did not return a verdict upon the charge of terroristic threatening in the first degree as to Kerry (Count III) due to a merger of this offense with the charge in Count IV.

**16.** Scott was also required to pay restitution jointly and severally with Jefferson, in addition to paying court fees.

**17.** The ICA did not address Scott's June 22, 2010 Request Form II requesting the video recording of Jefferson's trial proceedings.

an effective defense or appeal. 2012 WL 6568233, at *1.

Finally, the ICA faulted Scott for not submitting his request for transcripts until, at the earliest, June 15, 2010, when trial was scheduled for June 23, 2010. *Id.* at *2. Thus, the ICA concluded that Scott had failed to establish that the circuit court erred in denying his request for transcripts. *Id.*

## III.

In his application for writ of certiorari, Scott maintains that the ICA erred in finding that the circuit court properly denied his transcript requests. Scott argues that the testimonies of Kerry and Leif were essential for trial preparation and effective cross-examination of these witnesses at his trial. Additionally, Scott contends that he should not have been required to allege any specific reasons for requesting the transcripts of Jefferson's trial proceedings because such transcripts are innately valuable for trial preparation and impeachment purposes. Scott further notes that the court's request forms did not require him to state a reason or an argument for requesting the transcripts.

Scott also argues that the ICA erred by not addressing his contention that the requested transcripts related to a trial involving the "exact" same incident and witnesses as his own case. Scott clarifies that his contention is not that he is entitled to "transcripts for any proceeding ever held in any case," but only that he is entitled to "transcripts from a case dealing with the identical facts and witnesses as his case." Scott argues that "his court appointed counsel is best suited to know" why certain transcripts would be "vital" to his defense.

## IV.

### A.

It is well-settled that an indigent "criminal defendant has a right to transcripts of prior proceedings." *State v. Mundon,* 121 Hawai'i 339, 357, 219 P.3d 1126, 1144 (2009) (citing *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971)). In *Mundon,* this court held that the indigent

defendant was entitled to the written transcripts of his prior proceedings. 121 Hawai'i at 358, 219 P.3d at 1145. The defendant had filed several pretrial motions seeking the written transcripts of the preliminary hearing and grand jury proceeding in his case. *Id.* at 345, 219 P.3d at 1132. The trial court rejected the defendant's motions because of "non-conformities with the rules of court." *Id.* at 355, 219 P.3d at 1142. The court provided the defendant with compact disks (CDs) of the relevant proceedings, but the defendant "was unable to review the electronic transcripts until the first day of trial because" neither he nor his standby counsel "ha[d] the requisite equipment available[.]" *Id.* at 358, 219 P.3d at 1145.

The ICA in *Mundon* had held that the trial court's error in failing to provide the defendant with the written transcripts was "harmless inasmuch as [the defendant] failed to show that he was prejudiced by proceeding at trial without written transcripts." *Id.* at 357, 219 P.3d at 1144. Although the defendant "claim[ed] that he was entitled to a transcript of the preliminary hearing so he could cross-examine the complaining witness, who allegedly was unable to identify him at the preliminary hearing[,]" the ICA found that he failed to "substantiate[ ] this claim by including the transcript of the preliminary hearing in the record on appeal." *Id.* (quotation marks omitted). In regard to the transcript of the grand-jury proceeding, the ICA explained that "all that transpired before the grand jury was the playing of the tape recording of the complaining witness's interview with a police officer, which recording had previously been provided to [the defendant]." *Id.* (quotation marks omitted).

On review, this court held that the ICA erred in concluding that the trial court's failure to provide the defendant with the written transcripts was harmless error. *Id.* at 358, 219 P.3d at 1145. In making this determination, the court relied on the United States Supreme Court's decision in *Britt,* 404 U.S. 226, 92 S.Ct. 431. 121 Hawai'i at 357, 219 P.3d at 1144. In *Britt,* the Court held that "the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effec-

tive defense or appeal." 404 U.S. at 227, 92 S.Ct. 431 (footnote omitted).

The *Britt* Court "identified two factors that are relevant to the determination" of whether a transcript is "needed" for an effective defense: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.* at 227–28, 92 S.Ct. 431. In regard to the first factor, the Court held that because it had "consistently recognized the value to a defendant of a transcript of prior proceedings," the defendant was not required to make "a showing of need tailored to the facts of the particular case." *Id.* at 228, 92 S.Ct. 431.

In *Mundon,* the court applied the two-part *Britt* test. In addressing the first factor, the court quoted from the *Britt* decision in describing the value of the transcripts of prior proceedings to the defendant:

> Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, *without requiring a showing of need tailored to the facts of a particular case* and, even in the absence of specific allegations, it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

121 Hawai'i at 357, 219 P.3d at 1144 (quoting *Britt,* 404 U.S. at 228, 92 S.Ct. 431) (brackets and ellipses omitted). The *Mundon* court concluded that "there is innate value to a criminal defendant in being able to review transcripts for trial preparation and impeachment purposes such that a defendant need not show a particularized need for such transcripts[.]" *Id.* at 358, 219 P.3d at 1145 (emphases added). Thus, the defendant was not required to have included the transcripts of the preliminary hearing or grand jury proceeding in the record on appeal or to "otherwise identify specific examples of prejudice." *Id.* at 357, 219 P.3d at 1144.

Second, the court found that no adequate alternatives to the written transcripts existed. *Id.* at 358, 219 P.3d at 1145. The court explained that although the defendant was provided with CDs of the relevant proceedings, he "was unable to review the electronic transcripts until the first day of trial" due to the lack of equipment, and the trial court only permitted the defendant to review the CDs during the breaks in trial. *Id.* Thus, the court concluded that "[b]ecause [the defendant] was essentially provided the transcript for the first time at trial, the electronic transcripts were not an adequate alternative to the written transcripts[.]" *Id.* Additionally, the record did not reveal any other available alternative to the written transcripts. *Id.*

The *Mundon* court concluded that the defendant satisfied the two-part *Britt* test and consequently, "[the defendant] was not required to show that he was prejudiced by proceeding to trial without the written transcripts[.]" *Id.*

In the instant case, the two-part *Britt* test is similarly applicable in determining whether the ICA erred in affirming the circuit court's denial of Scott's request for the written transcripts or a video recording of Jefferson's trial proceedings.

In regard to the first *Britt* factor, Scott argues that based upon *Britt* and *Mundon,* he was not required to demonstrate a particularized need for the transcripts of Jefferson's trial proceedings. Scott contends that the holdings in *Britt* and *Mundon* suggest a broader application of an indigent defendant's right to transcripts that is not necessarily limited to transcripts of prior proceedings in the defendant's own case. Scott notes that the first *Britt* factor states that the defendant must demonstrate the "value of the transcript to the defendant *in connection with the appeal or trial for which it is sought,*" and argues that this language "implies that defendants may in fact seek transcripts that would help them in their own case, regardless of whether it was from a proceeding in their case alone."

As Scott argues, the *Mundon* court recognized that transcripts of a prior proceeding are innately valuable for trial preparation and impeachment purposes. 121 Hawai'i at 358, 219 P.3d at 1145. The Ninth Circuit has

also recognized the critical importance of prior trial transcripts, holding that the trial court's failure to provide the defendant with the transcript of the State's opening and closing arguments in the defendant's prior mistrial was prejudicial to the defendant because those portions of the trial were "crucial to the development of an effective defense." *Kennedy v. Lockyer*, 379 F.3d 1041, 1057 (9th Cir.2004). The court explained:

> Various tactical and strategic decisions made by Kennedy's new counsel might have been affected had he been provided with a copy of the prosecutor's opening statement and closing argument; he might, for example, have been able to anticipate some of the prosecution's key arguments, identify potential weaknesses in its case, assess the relative weight that the prosecution would place on various items of evidence, and better determine what would be needed to refute them.

*Id.* (emphases added).

■ Similarly, a codefendant's transcript is essential to the "development of an effective defense" in cases where the defendant and codefendant's charges arise from the same event and involve the same issues and witnesses.[18] The defendant's ability to reference the codefendant's trial transcript would affect "various tactical and strategic decisions" made by the defense, such as enabling the defense to identify potential weaknesses in the State's case as well as inconsistencies in witness statements.

Indeed, a codefendant's trial transcript is arguably of greater value to a defendant for trial preparation purposes than a transcript of a defendant's own prior trial proceeding. A defendant is presumably familiar with the prior proceedings of his or her own case. *See McKibbon v. State*, 749 S.W.2d 83, 87 (Tex.Crim.App.1988) (en banc) (Clinton, J., dissenting) ("a transcription of testimony and evidence admitted against a confederate in an earlier trial of the same transaction is likely to be more valuable than transcripts of a mistrial ... for the very practical reason that appellant was not present at the former and, therefore, not familiar with the evidence

adduced as he would be at his own prior trial"). Absent a change of counsel, defense counsel would have been present during the defendant's prior trial proceedings and therefore would have been aware of the strategies employed by the State and any inconsistencies in the witness's statements.

In contrast, in a situation involving the codefendant's trial transcripts, the defendant and defense counsel may not have been present at the codefendant's trial and may consequently lack the same level of knowledge regarding the State's approach in presenting its case. However, the State prosecutor (or a deputy from the same office) would have participated in the codefendant's trial and examined the witnesses. Thus, the State's prosecutor would be informed of what areas of testimony to avoid and what areas to pursue, whereas defense counsel would be without the benefit of such knowledge. This considerable strategic advantage is gained by the State even if the State forgoes ordering the transcript for its own purposes.

In *People v. Russell*, the Illinois Appellate Court recognized this strategic importance of codefendant trial transcripts, and thus held that an indigent defendant was entitled to the transcripts of his codefendants' trial. 7 Ill.App.3d 850, 289 N.E.2d 106, 108 (1972). In that case, prior to the defendant's trial on a burglary charge, his two codefendants were tried and convicted of the same crime. *Id.* at 107. The defendant filed a motion requesting the transcripts of his codefendants' trial, explaining only that the transcripts were "essential to the preparation of his defense" in his trial. *Id.*

In determining that the trial court erred in denying the defendant's requests, the court noted that a key witness against the defendant had "also testified extensively at the trial of the co-defendants." *Id.* at 108. The court reasoned that "[w]ithout a copy of the transcript, ... [the] defendant was unable to cross-examine" the witness "with respect to the [witness's] previous testimony or to search for any inconsistencies which might exist." *Id.* The court further noted that the

---

18. "Codefendant" is defined as "one of two or more defendants sued in the same litigation or charged with the same crime." *Black's Law Dictionary* 293 (9th ed. 2009) (emphasis added).

fact that the State "made no use of the transcript in preparation of its case" was irrelevant, as "a defendant [is] not prejudiced only where he is denied access to transcripts which were employed by the State at the prosecution of the trial," and "a transcript which is of little value to the State in preparation of its case might be of great value to the defense in preparation of its case." *Id.* The court reversed the defendant's conviction and remanded for a new trial with instructions that the State provide the defendant with a copy of the requested transcript. *Id.*

Here, the charges against Scott and Jefferson were intricately related, as they involved the same underlying incident and complainants, and were based on similar allegations of wrongful conduct. The State's Notice of Liability in Scott's case asserted that the State would present evidence that Scott and Jefferson aided one another in committing the crimes charged.

The State, having prosecuted Jefferson prior to Scott's trial, had the benefit of having examined the witnesses and being informed of any areas of testimony that were subject to impeachment. The jury in Jefferson's trial rejected at least part of the State's case in regard to the most serious charge against Jefferson, as he was convicted of the included offense of assault in the third degree. Only the State would have gained knowledge of the possible explanation for the trial result in Jefferson's case. The defense, without the transcripts or DVD of Jefferson's trial, would lack any knowledge, for example, regarding issues that had arisen pertaining to witness credibility or contradictory evidence. Although it is not clear from the record whether Jefferson testified at his trial, if he had, then it would certainly be of significant value to Scott's defense strategy to know whether Jefferson made any admissions regarding where he kicked Leif (in the face or body), and whether Jefferson attempted to place more or less blame on Scott.

Finally, similar to the situation in *People v. Russell, supra,* Kerry was the key witness testifying on behalf of the State in both Jefferson's and Scott's trials. She was the only witness to the altercation other than the Scotts and Leif, who was unconscious for much of the incident. Her testimony was critical to both cases. Kerry's version of the events as given at Scott's trial diverged significantly from Scott's recounting of the incident. Thus Kerry's credibility was clearly important to the State's case. Because Scott's requests for the written transcripts and DVD of Jefferson's trial were denied, defense counsel was unable to become informed of Kerry's testimony in Jefferson's trial and was prevented from comparing her former testimony with the testimony she gave in Scott's trial.

Thus, there was a clear interrelationship and overlap between the two cases, such that Jefferson's trial transcript was innately valuable to Scott's ability to prepare an effective defense. The innate value of transcripts for trial preparation and impeachment purposes is the same or substantively equivalent for a defendant with respect to the transcripts of a codefendant's trial and the transcripts of the defendant's prior proceedings, when the offense(s) charged against the codefendants arise out of the same incident, have the same key witnesses, and involve the same underlying facts.

The ICA did not recognize that Jefferson's trial transcript was innately valuable to Scott's defense. Rather, the ICA emphasized that Scott's request for the transcripts did not "provide any reason for the request" or "indicate, on its face, any reason that the transcripts are 'necessary for an adequate defense'." [19] *Scott,* 2012 WL 6568233, at *1.

**19.** The ICA also cited the fact that Scott "did not submit his request for these transcripts until, at the earliest, June 15, 2010, when trial was scheduled for June 23, 2010," as support for its conclusion that the circuit court did not err in denying the transcript requests. *Scott,* 2012 WL 6568233, at *2. However, the record indicates that trial was set for June 29, 2010. Additional-

ly, the Motion to Continue Trial was Scott's first request for a continuance, and defense counsel explained in his attached declaration that he had not ordered the transcripts of Jefferson's trial at an earlier date because he had anticipated that "the case was headed in the direction of a plea agreement" and wanted to avoid unnecessary costs. This is not necessarily an insubstantial

However, requiring the defendant to show a "particularized need" for a codefendant's trial transcripts by identifying specific portions of the transcript that the defendant will require for impeachment purposes imposes the "practically impossible burden of showing detailed information contained within a document that he can not possess." *Melendez v. State*, 942 S.W.2d 76, 80 (Tex.Ct.App.1997) (Chavez, J., dissenting).

In light of the innate value of the written transcripts or the DVD of Jefferson's trial proceedings for Scott's trial preparation and impeachment purposes, Scott was not required to show a particularized need for the transcripts or DVD, and the circuit court and the ICA erred in holding otherwise.

### B.

The second factor relevant to the determination of an indigent defendant's claim of right to a transcript is "the availability of alternative devices that would fulfill the same functions as a transcript." *Britt*, 404 U.S. at 227, 92 S.Ct. 431. "A defendant who claims the right to a free transcript does not . . . bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight." *Id.* at 230, 92 S.Ct. 431. Thus, the State has the burden of proving that a defendant has been provided adequate alternatives to a written transcript.

In *Britt*, the Court found that the defendant had an adequate alternative to a transcript of his prior mistrial, where the defendant conceded that the court reporter "would

at any time have read back to [defense] counsel his notes of the mistrial, well in advance of the second trial, if counsel had simply made an informal request." *Id.* at 229, 92 S.Ct. 431.

In *Mundon*, this court held that an adequate alternative to the written transcripts was not made available to the defendant. 121 Hawai'i at 357–58, 219 P.3d at 1144–45. In reaching this determination, the court noted that "the transcript must be available to defense counsel prior to the trial if it is to be useful as an impeachment and trial preparation tool." *Id.* at 358, 219 P.3d at 1145 (citing *Gonzales v. Dist. Court In and For Weld Cnty.*, 198 Colo. 505, 602 P.2d 857, 858 (1979) (en banc)) (quotation marks omitted). Thus where the *Mundon* defendant was essentially provided electronic transcripts for the first time at trial, the transcripts were not an adequate alternative to the written transcripts.

In this case, not only did the circuit court deny Scott's requests for written transcripts of Jefferson's trial, but the court also denied Scott's requests for the DVD video recordings of the proceedings.[20] In addition, the record does not reveal that any other available alternative to the written transcripts or the DVD was provided to Scott.[21]

The State contends that the transcript of Scott's grand jury proceeding, "a written statement from the only eyewitnesses, and the 911 tape" were alternative devices that fulfilled the same function as the written transcripts of Jefferson's trial pro-

---

reason for court-appointed counsel to defer the ordering of transcripts in appropriate circumstances. Defense counsel had also represented that Scott was willing to waive his "[HRPP] Rule 48 and speedy trial rights" for the period of time necessary to obtain the requested transcripts.

**20.** The State argues that Scott "did nothing to request an order from the assigned Judge Strance by filing a Motion to allow him the transcripts." The record indicates, however, that the basis of Scott's Motion to Continue Trial was to obtain the transcripts of Jefferson's trial proceedings, which was denied by the circuit court.

At the time of Scott's trial, the HRPP did not require court-appointed counsel to file a formal motion to request transcripts for purposes other

than appeal. HRPP Rule 44(b)(ii), which came into effect on July 1, 2011, now requires court-appointed counsel to make a request for transcripts for purposes other than appeal by submitting a "motion, with proof of service," prior to ordering the transcript. The rule further provides that "[t]he motion shall be supported by declaration or affidavit that show cause as to why the motion should be granted."

**21.** The *Mundon* court did not hold that CDs of the relevant transcripts would constitute an adequate alternative to the written transcripts of the proceedings. Similarly, we do not reach the question of whether a video or audio recording of the relevant proceedings would constitute an adequate alternative to the written transcripts. Such a determination would be fact-specific.

ceedings. Although these materials are valuable for trial preparation and impeachment purposes, the State's argument that they are adequate alternatives to a written transcript or DVD of Jefferson's trial proceedings is without merit. "A grand jury proceeding is not adversar[ial] in nature and is only a preliminary determination of whether a criminal proceeding should be instituted." *State v. Rodrigues*, 63 Haw. 412, 417, 629 P.2d 1111, 1115 (1981). The defendant and defense counsel are not entitled to be present at a grand jury proceeding. *Id.* (citing HRPP Rule 6(d)). Thus, testimony given at Scott's grand jury proceeding is not comparable to testimony given during Jefferson's trial, as during the trial the witnesses would have been required to give a more exhaustive, detailed rendition of the events and would have been subject to cross-examination. Similarly, a prior written statement and recorded 911 call are not adequate substitutes for testimony given during a trial proceeding.

Thus, Scott was not provided with any alternative to the written transcripts or to the video recording of Jefferson's trial. Based on the foregoing, it is clear that Scott has demonstrated that the written transcripts or DVD of Jefferson's trial were necessary for an effective defense, as 1) the transcripts and DVD were innately valuable to Scott in connection with his trial, and 2) no adequate alternative was provided to Scott prior to the trial. Thus, the circuit court erred in denying Scott's requested transcripts and DVD video recordings.

## C.

■ Our decision is consistent with the well-established "principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt*, 404 U.S. at 227, 92 S.Ct. 431. The *Britt* court applied this principle to require the State to "provide an indigent defendant with a transcript of prior proceedings when

that transcript is needed for an effective defense or appeal." *Id.*

The transcripts of Jefferson's trial proceedings were essential to Scott's ability to mount an effective and adequate defense due to the integrated and overlapping nature of Scott's and Jefferson's cases. If Scott had been able to afford the transcripts on his own, then he would have had the "basic tools of an adequate defense or appeal." *Id.* The only reason Scott was denied a basic tool for his defense was that he was unable to pay for the transcripts or DVD of Jefferson's trial proceedings.

In addition, had Scott been represented by the Office of the Public Defender, that office would have been <u>required</u> to obtain the transcripts upon determining that they were "necessary for an adequate defense" and that Scott was unable to pay for them:

> The court may, upon a satisfactory showing that a criminal defendant is unable to pay for <u>transcripts</u> . . ., and upon a finding that the same are necessary for an adequate defense, direct that such expenses be paid from available court funds or waived, as the case may be; provided that <u>where the defendant is represented by the state public defender</u> or by other counsel appointed by the court except for such other counsel appointed by the court for reasons of conflict of interest on the part of the public defender, <u>the public defender shall pay for or authorize payment for the same, if the public defender determines that the defendant is unable to pay for the same and that the same are necessary for an adequate defense</u>[.]

HRS § 802–7 (1993) (emphases added). Thus, the public defender's office obtains and pays for transcripts without having to first receive the court's approval.[22] *Id.*

However, because Scott was represented by court-appointed counsel as a result of a conflict of interest, the circuit court, rather than counsel, determined whether the requested transcripts were necessary for an adequate defense and whether Scott had the ability to pay for the transcripts:

---

**22.** This is also true when counsel is appointed for a defendant for reasons other than a conflict of interest with the public defender's office. HRS § 802–7.

In cases where other counsel have been appointed by the court for reasons of conflict of interest, the court may, upon the requisite showing of inability to pay and a finding that such expenses are necessary for an adequate defense as set forth above, direct that such expenses be paid from available court funds or waived, as the case may be.

*Id.* (emphasis added).

Although the language of HRS § 802–7 suggests that the court has discretion to direct that transcript expenses are paid ("The court may, upon the requisite showing . . . ."), the balance of the pertinent statutory language indicates that once a satisfactory showing of need for the transcripts and inability to pay has been made, the court should direct that such expenses be paid, unless alternative means for timely obtaining the transcripts are available.[23] This is evident as the statute mandates that the public defender's office is required to furnish the relevant transcripts upon making the same findings as the court ("the public defender shall pay for or authorize payment"). *Cf. State v. Castro,* 93 Hawai'i 454, 461–62, 5 P.3d 444, 451–52 (App.2000) (Acoba, J., concurring) ("While the term 'may' [used in HRS § 704–404 governing defendants' fitness to proceed with trial] suggests that discretion inheres in the trial court as to whether to appoint examiners, the balance of the pertinent statutory language suggests that only some rational

basis for convening a panel is necessary to trigger the court's appointive power."), *vacated in part and affirmed in part by* 93 Hawai'i 424, 5 P.3d 414 (2000) (adopting Justice Acoba's concurring opinion in its entirety).

Permitting the court to make a discretionary determination as to whether to furnish the necessary transcripts, in the identical situation where the public defender's office would be required to furnish the transcripts, could also raise equal protection concerns.[24] Thus, whether an indigent defendant is represented by the public defender's office or by court-appointed counsel, once it is determined that transcripts are "necessary for an adequate defense" and the defendant is unable to pay, the transcripts are required to be furnished.

In making the determination as to whether requested transcripts are necessary for an adequate defense, the court should give due consideration to the recommendations of defense counsel, who may be in the best position to determine whether transcripts are necessary for an adequate defense.[25] *See* HRPP Rule 44(b)(ii) (2011) (requiring court-appointed counsel to submit motion requesting transcripts and declaration or affidavit showing cause as to why the motion should be granted).[26] *Cf. Russell,* 289 N.E.2d at 108 ("a transcript which is of little value to the State in preparation of its case might be of

---

23. Where a request for transcripts is made in an untimely manner without adequate reason and results in a motion for continuance of trial, the court maintains its discretionary authority to determine the appropriate disposition of the motion.

24. Equal protection concerns would appear to favor requiring the court to furnish transcripts in a situation where the public defender's office is obligated to furnish transcripts, without conditioning such furnishing upon financial considerations. *Cf. Mayer v. City of Chicago,* 404 U.S. 189, 195, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971) ("the State must provide a full verbatim record where that is necessary to ensure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way"); *Roberts v. LaVallee,* 389 U.S. 40, 42, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (per curiam) ("Our decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based

upon the financial situation of the defendant, are repugnant to the Constitution."); *Douglas v. California,* 372 U.S. 353, 355, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) ("For there can be no equal justice where the kind of an appeal a man enjoys depends on the amount of money he has.") (quotation marks omitted); *Griffin v. Illinois,* 351 U.S. 12, 19, 76 S.Ct. 585, 100 L.Ed. 891 (1956) ("Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.").

25. In the analogous situation where a defendant is represented by the public defender's office or by private counsel, counsel has the sole authority to determine that the transcripts are necessary for an adequate defense and to furnish the transcripts under HRS § 802–7.

26. Counsel has a duty to make a good faith evaluation as to whether the transcripts are necessary for an adequate defense.

great value to the defense in preparation of its case").

### D.

■ Having determined that the circuit court erred by failing to provide Scott with the written transcript or DVD of his codefendant's trial, it remains to be decided whether this error mandates vacating Scott's conviction and remanding for a new trial or whether a harmless beyond a reasonable doubt standard should be applied.

In *Mundon*, the court held that the ICA erred in concluding that the trial court's failure to provide Mundon with the written transcripts of his prior proceedings was harmless error, as "Mundon was not required to show that he was prejudiced by proceeding to trial without the written transcripts[.]" 121 Hawai'i at 358, 219 P.3d at 1145. Thus, *Mundon* appears to require automatic reversal when an indigent defendant is wrongfully denied the transcript of his or her prior proceeding.

Other courts have similarly held that "the erroneous denial of an indigent defendant's motion for a free transcript of a prior trial requires automatic reversal." *People v. Hosner*, 15 Cal.3d 60, 123 Cal.Rptr. 381, 538 P.2d 1141, 1148 (1975) (in bank). *See Kennedy v. Lockyer*, 379 F.3d 1041, 1053 (9th Cir.2004) ("Where the state completely fails to provide an indigent defendant with a transcript of a mistrial for use in connection with a second trial, we would likely find a structural error, requiring automatic reversal."); *Turner v. Malley*, 613 F.2d 264, 266–67 (10th Cir.1979) (holding that *Britt* requires automatic reversal where the state fails to provide defendant with transcript of first trial for use at second trial and fails to show alternative device); *United States v. Pulido*, 879 F.2d 1255, 1259 (5th Cir.1989) ("On balance, we conclude that a harmless error analysis would not be appropriate in this case.... [W]e note that it would be an unjustifiable waste of appellate resources to require an exhaustive comparison of trial transcripts in every case in which a transcript has been denied."); *United States v. Talbert*, 706 F.2d 464, 471 (4th Cir.1983) (reversing defendants' convictions "because the government did not provide the defendants with a copy of the transcript of their first trial").

The California Supreme Court in *Hosner* explained that this per se standard was preferable because of the difficulty of assessing the prejudicial effect of the denial of a transcript of the defendant's prior proceedings. 123 Cal.Rptr. 381, 538 P.2d at 1148–49. In that case, the court found that the trial court erred by denying the defendant's motion for a transcript of his first trial, which ended in a mistrial. *Id.*, 123 Cal.Rptr. 381, 538 P.2d at 1143. In deciding whether this error mandated reversal of the defendant's conviction, the court first explained that the denial of a transcript from a prior trial "infects all the evidence offered at the latter trial":

> The denial of the transcript does not merely taint some specific items of evidence, leaving other items which might of their own force provide overwhelming evidence of guilt beyond a reasonable doubt. Rather, in the manner of the denial of the assistance of counsel, the denial of a transcript of a former trial infects all the evidence offered at the latter trial, for there is no way of knowing to what extent adroit counsel[,] assisted by the transcript to which the defendant was entitled[,] might have been able to impeach or rebut any given item of evidence.

*Id.*, 123 Cal.Rptr. 381, 538 P.2d at 1148 (emphasis added).

The court then observed that assessing the prejudicial effect of an erroneous denial of a prior trial transcript would require the appellate court to speculate to an unacceptable degree:

> Even if an appellate court were to undertake the extraordinary burden of reviewing the records of both trials, the court would be able only to hypothesize what use at the latter trial could have been made of the transcript of the former trial. While the assessment of the prejudicial effect of error always requires some speculation by the reviewing court as to how an average jury would have decided the case in the absence of the error, an entirely new level of compound conjecture would be entailed in a court's first speculating what evidence

might have been impeached, and how, and only then speculating how the trier of fact would have reacted to the speculated efforts at impeachment.

*Id.* (emphasis added). Based on this analysis, the court reversed the defendant's judgment.[27] *Id.*, 123 Cal.Rptr. 381, 538 P.2d at 1149.

In the context of an indigent defendant's right to the transcripts of a codefendant's trial, the Illinois Appellate Court in *People v. Russell* held that the trial court erred in denying the indigent defendant's request for the transcript of his codefendants' trial, and consequently vacated the defendant's conviction and remanded for a new trial with instructions that the State provide the defendant with the required transcript. 7 Ill. App.3d 850, 289 N.E.2d 106, 108 (1972). On the other hand, a harmless error standard has also been applied in a case involving the trial court's denial of an indigent defendant's request for a codefendant's trial transcripts. *State v. Razinha*, 123 Ariz. 355, 599 P.2d 808, 811–12 (Ariz.Ct.App.1979) (trial court's denial of codefendant's transcript was harmless beyond a reasonable doubt where key witness's testimony at defendant's trial supported defendant's theory of case); *see United States v. Bamberger*, 482 F.2d 166, 168–69 (9th Cir. 1973) (any error in denial of transcript of codefendant's second trial was harmless, where defendant was provided transcript of codefendant's first trial, defense counsel cross-examined eyewitness on inconsistencies with statements made at first trial and in investigative reports, and defendant "could neither reasonably hope for, nor realistically gain, more telling or damaging impeachment tools from the transcript he was denied").

In this case, we need not decide whether the applicable standard upon finding that the trial court erroneously denied an indigent defendant's request for the transcripts of a codefendant's trial is a per se standard resulting in vacating and remanding for new trial, or a harmless beyond a reasonable doubt standard. Under either standard, remand for a new trial is required in this case.

Although Jefferson's trial transcripts are not available in the record on appeal, the denial of the requested transcripts was clearly not harmless beyond a reasonable doubt, as Jefferson and Scott were codefendants whose charges arose out of the same incident and involved identical facts and the same critical witnesses.

As noted, Kerry was the State's primary witness against Scott, and her version of the events substantially diverged from Scott's testimony. Under these circumstances, where the credibility of a key witness is of critical importance, providing defense counsel with a transcript of the witness's prior trial testimony assumes even greater significance. *Cf. Riggins v. Rees*, 74 F.3d 732, 738 (6th Cir.1996) (transcripts of defendant's prior trials "assumes even greater importance in close cases"). The probability that having the transcripts of Jefferson's trial would have affected defense counsel's strategy and facilitated effective cross-examination precludes the circuit court's error from being declared harmless beyond a reasonable doubt. *Cf. Asfaw v. Commonwealth*, 56 Va. App. 158, 692 S.E.2d 261, 265 (2010) (probability that defense counsel could have challenged witnesses' testimony with inconsistent statements made at preliminary hearing "precludes the trial court's error from being declared harmless beyond a reasonable doubt").

Therefore, under either a per se standard or a harmless beyond a reasonable standard, the circuit court's erroneous denial of Scott's requested transcripts requires the case to be remanded for a new trial.

### V.

Accordingly, we vacate the ICA's January 15, 2013 Judgment on Appeal and the circuit court's August 30, 2010 Judgment and remand the case for a new trial consistent with this opinion.

Concurring Opinion by ACOBA, J.

I concur that the case must be remanded for a new trial because the circuit court erred

---

**27.** The *Hosner* court expressly "reserve[d] decision [on] whether the per se rule of prejudice ... should also be applied to an erroneous denial of a transcript of some other prior proceeding." *Id.*, 123 Cal.Rptr. 381, 538 P.2d at 1149 n. 7.

in denying the request of Petitioner/Defendant–Appellant Kevin Alexander Scott (Scott) for transcripts of his codefendant's trial. However, I would hold that this error mandates the vacation of Scott's conviction without any showing of prejudice by Scott. The denial of a request for written transcripts of a prior trial has "so pervasive an effect on the reliable ascertainment of truth at [the subsequent] trial that reversal must automatically result."[1] *People v. Hosner*, 15 Cal.3d 60, 123 Cal.Rptr. 381, 538 P.2d 1141, 1148 (Cal.1975). Consequently, as set forth *infra*, the harmless beyond a reasonable doubt standard[2] should not be applied.

## I.

### A.

In *State v. Mundon*, 121 Hawai'i 339, 219 P.3d 1126 (2009), the defendant, indigent and proceeding pro se, requested written transcripts of a preliminary hearing and grand jury proceeding in his case. *Id.* at 355, 219 P.3d at 1142. Instead of written transcripts, the defendant was given Compact Disk (CD) recordings of the prior proceedings. *Id.* Because the defendant was imprisoned, he lacked the equipment necessary to review the CD recordings and consequently the recordings were "useless." *Id.* at 355–36, 219 P.3d at 1142–43. Nevertheless, the Intermediate Court of Appeals (ICA) concluded that "the trial court's failure to provide [the defendant] with the written transcripts was harmless inasmuch as [the defendant] failed to show that he was <u>prejudiced</u> by proceeding at trial without written transcripts." *Id.* (emphasis added).

This court held that *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), was "instructive" regarding "whether [the defendant] was required to show that he was prejudiced by proceeding to trial without the written transcripts." *Mundon*, 121 Hawai'i at 357, 219 P.3d at 1144. In *Britt*, "the Supreme Court ... recognized the <u>innate</u> value of transcripts [of the defendant's prior trial] for trial preparation and impeachment purposes and [held] that a defendant need not show a need for the transcripts 'tailored to the facts of a particular case[.]'" *Id.* (emphasis added). Therefore, the defendant was not required to "identify specific examples of prejudice." *Id.*

This court said, it was only necessary to show that no adequate alternative to the written transcripts existed. *Id.* Hence, "the ICA erred in concluding that the trial court's failure to provide [the defendant] with written transcripts was harmless error." *Id.* In my view, we have already decided that the failure to provide the defendant with transcripts of prior proceedings in his own case constitutes grave error without the need to show prejudice and consequently, the defendant is entitled to a new trial.

### B.

The rule mandating vacation of an order denying transcripts without a showing of prejudice is justified because "even in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses." *Britt*, 404 U.S. at 228, 92 S.Ct. 431.

---

**1.** Under Hawai'i law, "when used in an dispositional order, the word 'reverse' ends litigation on the merits." Hawai'i Rules of Appellate Procedure (HRAP) Rule 35(e). However, in California, "if a judgment against the defendant is reversed, such reversal shall be deemed an order for a new trial, unless the appellate court shall otherwise direct." Cal. Penal Code § 1262 (West 2013); *accord People v. Murphy*, 59 Cal.2d 818, 31 Cal.Rptr. 306, 382 P.2d 346, 356 (Cal. 1963) ("An unqualified reversal remands the cause for new trial[.]"). In *Hosner*, the California Supreme Court's reversal was "unqualified." *Hosner*, 123 Cal.Rptr. 381, 538 P.2d at 1149. Hence, the "reversal" in *Hosner* was the equivalent of a "vacation" under Hawai'i law. *See* HRAP Rule 35(e) ("When used in an opinion or dispositional order ... the phrase 'vacate and remand' indicates the litigation continues in the court or agency in accordance with the appellate court's instruction.").

**2.** Under the harmless beyond a reasonable doubt standard, an appellate court must determine "whether there is a reasonable possibility that error might have contributed to conviction." *State v. Schnabel*, 127 Hawai'i 432, 450, 279 P.3d 1237, 1255 (2012).

Even as to adequate modes of reviewing prior proceedings, *Britt* indicated that "[a] defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight." [3] *Id.* at 230, 92 S.Ct. 431. In *Hosner*,[4] the California Supreme Court explained that it is impossible for an appellate court to assess the impact of the denial of a prior trial transcript because a court cannot ascertain how counsel might use the transcript in "impeaching or rebutting" evidence:

> [T]he denial of a transcript of a former trial infects all the evidence offered at the latter trial, <u>for there is no way of knowing to what extent adroit counsel assisted by the transcript to which the defendant was entitled might have been able to impeach or rebut any given item of evidence.</u>

123 Cal.Rptr. 381, 538 P.2d at 1148 (emphasis added). To apply the harmless error rule, we would be left to "hypothesize" as to how defense counsel would have used the unavailable transcripts. *See Mundon*, 121 Hawai'i at 380, 219 P.3d at 1167 (Acoba, J., concurring and dissenting). This would result in "an entirely new level of compound conjecture" leading this court to

> first speculat[e] what evidence might have been impeached ... [and] then speculat[e] [as to] how the trier of fact would have reacted to the speculated efforts at impeachment.... <u>[T]his would be speculation running riot.</u>

*Hosner*, 123 Cal.Rptr. 381, 538 P.2d at 1148 (emphasis added).

As in *State v. Cramer*, 129 Hawai'i 296, 299 P.3d 756 (2013), determining the prejudicial effect in the instant case would require this court to make unwarranted assumptions regarding the effect of the transcript on the defendant's trial strategy. *See id.* at 303,

299 P.3d 756, 299 P.3d at 771. This court is not privy to the confidential work product or mental processes of attorney and client and therefore we cannot know what the defendant's theory of the case would be with or without the transcripts nor can we compel disclosure of such matters. We cannot infringe upon the right to counsel or the attorney-client privilege by requiring counsel to identify specific trial strategies that he intended to pursue in order to demonstrate harmful error. *See Mundon*, 121 Hawai'i at 380, 219 P.3d at 1167 (Acoba, J., concurring and dissenting). It is not the role of this court to supplant defense counsel by guessing how a prior trial transcript <u>might</u> have been used. *See Cramer*, 129 Hawai'i at 303, 299 P.3d at 764; *see also Mundon*, 121 Hawai'i at 380, 219 P.3d at 1167 (Acoba, J., concurring and dissenting).[5]

## II.

The reasoning in *Britt, Mundon,* and *Hosner* applies with equal force when a defendant is denied the transcript of a codefendant's trial arising from common circumstances. The transcripts of a codefendant's trial are inherently necessary for a defendant to prepare for his or her own trial. The government's strategy and evidence in a defendant's trial are likely to be related to the strategy and evidence presented in the trial of his or her codefendant. Because the trial of a codefendant usually arises out of the same incident, the transcript of a codefendant's trial would be essential to the defendant's preparation of a defense.

Thus, "while counsel is studying [the transcript of the prior trial], the precise words used by a witness might trigger mental processes resulting in legitimate defense strategies which might otherwise be overlooked." *Britt*, 404 U.S. at 234–35, 92 S.Ct. 431 (Doug-

---

**3.** In *Britt,* however, rejection of the defendant's request for a free transcript was upheld because the defendant "conceded that he had available an informal alternative which appears to be substantially equivalent to a transcript." 404 U.S. at 230, 92 S.Ct. 431.

**4.** *Hosner* held that an indigent defendant was entitled to the transcript of a prior trial under the equal protection clause of the Fourteenth

Amendment to the United States Constitution. 123 Cal.Rptr. 381, 538 P.2d at 1143.

**5.** Moreover, "it would be an unjustifiable waste of appellate resources to require an exhaustive comparison of trial transcripts in every case in which a transcript has been denied." *United States v. Pulido*, 879 F.2d 1255 (5th Cir.1989)

las, J., dissenting). Since the State's case against the defendant may be closely linked to its case against a codefendant, strategic insights may be gained from defense counsel's analysis of a codefendant's trial. The transcripts of a codefendant's trial would also be valuable for purposes of impeachment, inasmuch as some or all of the same witnesses will likely testify in both trials.

Additionally, "portions of the transcript, other than the testimony of witnesses, are often crucial to the preparation of an effective defense." *Kennedy v. Lockyer*, 379 F.3d 1041, 1048 (9th Cir.2004). For example, "[o]pening and closing arguments may provide valuable insight into the government's strategy," and "motions to suppress or exclude often reveal ... information regarding damaging and prejudicial evidence that the [S]tate plans to introduce, and the rulings thereon may sometimes be case-dispositive." *Id.*

Insights from the transcripts of a codefendant's trial may only be gained by defense counsel when he or she actually reads the document. "Such spontaneity can hardly be forecast or articulated in advance in terms of special or particularized need." *Britt*, 404 U.S. at 234–35, 92 S.Ct. 431 (Douglas, J., dissenting). For example, a defendant may be unable to articulate how a transcript may be used for impeachment or to gain insight into the government's strategy without first reading the transcript. *See Melendez v. State*, 942 S.W.2d 76, 80 (1997) (Chavez, J., dissenting) (noting "the practically impossible burden" imposed by requiring a defendant to "show[ ] detailed information contained within a document that he [cannot] possess"). Because a defendant cannot be aware of the value of the transcript without first examining the transcript, requiring a defendant to make a showing of particularized need as a basis for obtaining the transcript of a codefendant's trial is problematical.

Thus, a defendant should not have to demonstrate a particular need for a transcript of his codefendant's trial. Such a requirement would be resurrected if, after a defendant demonstrated that the denial of a prior trial transcript was erroneous, he or she was required to demonstrate prejudice to establish on appeal that the error was not harmless. *See Pulido*, 879 F.2d at 1259. Hence, "it would be somewhat anomalous ... to dispense with the need to prove that a transcript would be valuable but to reincorporate these same considerations into our test by way of an after-the-fact prejudice analysis." *Id.* at 1259; *cf. Mundon*, 121 Hawai'i at 357, 219 P.3d at 1144 (holding that the ICA erred in applying a harmless error standard because the defendant was not required to show prejudice under *Britt* ).[6]

Based on the foregoing, it is apparent that the denial of a codefendant's trial transcript would "infect[ ] all of the evidence offered" at Scott's trial. *Hosner*, 123 Cal.Rptr. 381, 538 P.2d at 1148. Given the broad utility of a codefendant's trial transcript, it is not reasonably plausible for this court to determine that evidence would not have been more effectively impeached or rebutted by defense counsel with the aid of the transcript, or that

---

**6.** Respectfully, *State v. Razinha*, 123 Ariz. 355, 599 P.2d 808, 811–12 (Ariz.Ct.App.1979) and *United States v. Bamberger*, 482 F.2d 166, 168–69 (9th Cir.1973), cited by the majority, are inapposite. *Razinha* held that unlike a prior trial's transcript, the value of a codefendant's trial transcript "cannot be assumed." 599 P.2d at 811. But *Razinha* provided no explanation for this conclusion. The benefit of obtaining a transcript of defendant's prior trial and a transcript of a codefendant's trial are similar. In both circumstances, a defendant may use the transcript both to prepare his or her trial strategy and for impeachment purposes. *See* discussion *supra*. Hence, the Arizona court's application of the particularized need standard is not persuasive.

*Razinha* further held that the erroneous denial of a transcript of a co-defendant's trial was subject to harmless error analysis. *Id.* at 811–12. However, as explained *supra*, it would be inconsistent to require a defendant to demonstrate a particularized need for a transcript but nevertheless require the defendant to demonstrate prejudice in a harmless error analysis since the two considerations are virtually identical. *Pulido*, 879 F.2d at 1259.

Finally, neither *Razinha* nor *Bamberger* provide any rationale for the application of the harmless error standard. Inasmuch as requiring a showing of prejudice will inevitably require the trial and appellate courts to engage in fruitless speculation, *see Hosner*, 123 Cal.Rptr. 381, 538 P.2d at 1148; *cf. Cramer*, at 303, 299 P.3d at 764, the application of the harmless error standard in *Razinha* and *Bamberger* should not be followed.

defense counsel would not have altered his or her overall trial strategy. A request for a codefendant's trial transcript should be granted for the same reasons that justify granting trial transcripts of a defendant's prior trial in the same case.

### III.

*Britt* held that indigent defendants were entitled to relevant transcripts under the equal protection clause of the Fourteenth Amendment to the United States Constitution [7] because "the state must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." 404 U.S. at 227, 92 S.Ct. 431. In this context, "[i]t is difficult to conceive of a situation in which a litigant with means would not want an exact reproduction of the prior proceeding to aid in tracking prior testimony and procedural developments in preparation for and during the retrial." *Pulido,* 879 F.2d at 1259 (Clark, C.J., concurring). Accordingly, "[t]he clear implication of such a process ... in the mistrial/retrial situation is that almost every request should be granted." *Id.*

Based on the foregoing observations, a defendant with financial means would obviously order the transcripts of his or her codefendant's trial. It has been pointed out that "wealthier defendants tend to purchase transcripts [of a prior trial] as a matter of course," simply on the strength of the defendant's interests in effective trial preparation and impeaching the State's witnesses. *Britt,* 404 U.S. at 235, 92 S.Ct. 431 (Douglas, J., dissenting) (emphasis added); *see also Pulido,* 879 F.2d at 1259 (Clark, C.J., concurring).

Inasmuch as the considerations relevant to a defendant's request for his own trial transcript apply to a request for the transcript of a codefendant's trial, *see* discussion *supra,* it may also be assumed that a wealthier defendant would purchase his codefendant's transcripts "as a matter of course." Under *Britt,* indigent defendants must have the same "basic tools for an adequate defense" as those with financial means. Non-indigent defendants would not hesitate to determine whether a "particularized need" exists before ordering the transcripts of a codefendant's trial. Hence, such a requirement cannot be imposed on indigent defendants without violating Scott's right to equal protection of the law.[8]

### IV.

### A.

To reiterate, the denial of a transcript affects the ascertainment of truth at trial "as where there has been a denial of the assistance of counsel, a biased judge, or the introduction of a coerced confession." *Hosner,* 123 Cal.Rptr. 381, 538 P.2d at 1148 (citing *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Similarly, several Hawai'i decisions citing *Chapman* have concluded that there are some "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *State v. Suka,* 79 Hawai'i 293, 298, 901 P.2d 1272, 1277 (App.1995); *see also State v. Silva,* 78 Hawai'i 115, 121, 890 P.2d 702, 708 (App.1995) (holding that denial of the right to an impartial tribunal "by definition, is inherently prejudicial and not

---

**7.** The Fourteenth Amendment to the United States Constitution provides in relevant part that "[n]o state shall make or enforce any law which shall ... deny to any person with its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Indigent defendants should also be entitled to relevant transcripts under the Hawai'i Constitution on independent state grounds. *See* Haw. Const. art. 1, § 5 ("No person shall ... be denied equal protection of the laws[.]").

**8.** Nevertheless, it may be possible for the government to rebut the precept that a transcript of a codefendant's trial is innately valuable to a de-

fendant by showing that a defendant's request for a transcript is wholly frivolous. *Cf. Hosner,* 123 Cal.Rptr. 381, 538 P.2d at 1146 (noting that the State could "overcome the presumption of the defendant's particularized need for the transcript"); *State v. Blockyou,* 195 Kan. 405, 407 P.2d 519, 522 (Kan.1965) ("The state should not be required to subsidize frivolous requests for indigent appellants."). Frivolous claims are "lacking a legal basis or legal merit," or "not serious," *see Black's Law Dictionary* 739 (9th ed. 2009), and should be readily apparent without extensive examination. That issue is not raised here, however.

harmless"); *State v. Bowe*, 77 Hawai'i 51, 56, 881 P.2d 538, 543 (1994) (admission of coerced confessions is "fundamentally unfair"); *State v. Chow*, 77 Hawai'i 241, 251, 883 P.2d 663, 673 (App.1994) ("[W]e doubt that the denial of presentence allocution can ever be harmless error.").

In view of the inherent value of a transcript for purposes of discovery and impeachment, "it is not a matter of showing that the violation was harmless, but of showing that violation of the right to [the transcript] <u>oc-curred</u>." *Cramer*, 129 Hawai'i at 310, 299 P.3d at 770 (Acoba, J., concurring) (internal quotation marks omitted) (emphasis in original). Additionally, *Britt* undeniably established as a matter of equal protection the defendant's right to a transcript of a prior mistrial as a "basic tool of an adequate defense or appeal, where those tools are available for a price to other prisoners." 404 U.S. at 433, 92 S.Ct. 596.

### B.

Under the Hawai'i Constitution, "[t]his court, in determining whether to apply harmless error review in the violation of a particular right, should look to the 'nature of the right at issue as well as the effect of an error upon trial.'" *Cramer*, 129 Hawai'i at 311, 299 P.3d at 771 (Acoba, J., concurring) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (White, J., dissenting)) (internal brackets omitted). Thus, "[i]f a violation of the right would abort the basic trial process and render a trial or sentence fundamentally unfair, then an infraction of that right cannot be treated as harmless error." *Id.* (internal quotation marks and brackets omitted). "Once such an infraction is established, a criminal defendant thus is not required to show prejudice where the right that was violated protects important values underlying constitutional guarantees[.]" *Id.*

First, as to the nature of the right at issue, copies of a codefendant's trial transcripts are necessary for the purposes of trial preparation or the impeachment of the State's witnesses. *See Britt*, 404 U.S. at 228, 92 S.Ct. 431. Proceeding to trial without access to such information infringes on the defendant's right to present a defense, rendering the trial fundamentally unfair.

Moreover, the equal treatment of all defendants is a bedrock principle of our criminal justice system. "Both equal protection and due process emphasize the central aim of our entire judicial system—all people charged with [a] crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" *Griffin v. Illinois*, 351 U.S. 12, 17, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (quoting *Chambers v. Florida*, 309 U.S. 227, 241, 60 S.Ct. 472, 84 L.Ed. 716 (1940)). In furtherance of this principle, all defendants must be provided with the "basic tool[s] of an adequate defense." *See Britt*, 404 U.S. at 226, 92 S.Ct. 431. The denial of a codefendant's trial transcripts "renders a trial ... fundamentally unfair" if a defendant, because of his or her indigency, is denied access to items necessary to conduct a defense. As a matter of equal treatment, the erroneous deprivation of such transcripts cannot be deemed harmless.

Second, as to the affect of an error upon a trial, the *Fulminante* dissent explained that when "'a coerced confession constitutes a part of the evidence before a jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession.'" 449 U.S. at 290, 101 S.Ct. 509 (White, J., dissenting) (quoting *Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958)). Consequently, "[t]he inability to assess its affect on a conviction causes the admission at trial of a coerced confession to defy analysis by harmless error standards." *Id.* (internal quotation marks omitted). As explained *supra*, the denial of a codefendant's trial transcript permeates every aspect of trial. *Cf. Hosner*, 123 Cal.Rptr. 381, 538 P.2d at 1148. It is not reasonably possible for an appellate court to determine how the outcome of a trial would have been affected had transcripts not provided been instead allowed to a defendant. Hence, the "inability to assess" the effect of disallowed transcripts would defy "harmless error analysis." *Fulminante*, 499 U.S. at 291, 111 S.Ct. 1246 (White, J., dissenting).

In sum, based on both the "nature of the right" to a codefendant's trial transcripts as well as the affect the denial of such transcripts would have on the outcome of a trial, application of the harmless error standard would be wrong. *Cramer*, 129 Hawai'i at 310, 299 P.3d at 770 (Acoba, J., concurring). Therefore, the case must be remanded for a new trial.

## V.

Based on the foregoing, I respectfully concur.