**Electronically Filed
Supreme Court
SCWC-12-0000962
10-DEC-2014
08:20 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

LETITIA HARTER,
Petitioner/Defendant-Appellant.

SCWC-12-0000962

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000962; CR. NO. 11-1-1063)

December 10, 2014

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

This case concerns a defendant's right in a criminal case to be represented by counsel free from divided loyalties. Our decision addresses whether Letitia Harter's request for substitution of counsel should have been granted by the trial court. The court denied the request for new counsel, and following trial, a jury convicted Harter of all the charges

against her.  Harter appealed from the Judgment of Conviction and Sentence (judgment of conviction) of the Circuit Court of the First Circuit (circuit court).

The Intermediate Court of Appeals (ICA) affirmed the judgment of conviction in its Memorandum Opinion filed January 28, 2014.  We conclude the circuit court erred in not conducting a penetrating and comprehensive inquiry regarding the conflict of interest between Harter and her counsel, and we also find that Harter did not voluntarily consent to the attorney-client relationship.  Therefore, under our law, the denial of Harter's motion for withdrawal and substitution of counsel resulted in the derogation of Harter's right to effective assistance of counsel.  Accordingly, the ICA Judgment on Appeal and the judgment of conviction are vacated, and the case is remanded to the circuit court for further proceedings.

## I.   BACKGROUND

The charges in this case arose from a May 1, 2011 incident at Club 939, a Honolulu nightclub.  The police came to Club 939 in response to a call made by Harter complaining of sexual harassment.  The testimony is conflicting as to what happened when the police arrived, but an officer testified that he attempted to arrest Harter for disorderly conduct.  The officer testified that Harter resisted the arrest, and while he

tried to "gain control" of her, "unfortunately she swung over" and scratched his chin. Harter was arrested following the incident, and on May 5, 2011, the State of Hawai'i (State) filed a complaint against Harter in the District Court of the First Circuit (district court), charging her with the following offenses: (1) assault against a law enforcement officer in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707-712.6 (Supp. 2012);[1] (2) resisting arrest, in violation of HRS § 710-1026(1)(a) (1993 & Supp. 2012);[2] and (3) disorderly conduct in violation of HRS § 711-1101(1)(c) (1993 & Supp. 2012).[3]

---

[1] HRS § 707-712.6, Assault against a Law Enforcement Officer in the Second Degree, in relevant part, provides the following:

> (1) A person commits the offense of assault against a law enforcement officer in the second degree if the person recklessly causes bodily injury to a law enforcement officer who is engaged in the performance of duty.

[2] HRS § 710-1026, Resisting arrest, in relevant part, provides the following:

> (1) A person commits the offense of resisting arrest if the person intentionally prevents a law enforcement officer acting under color of the law enforcement officer's official authority from effecting an arrest by:
>
> (a) Using or threatening to use physical force against the law enforcement officer or another . . . .

[3] HRS § 711-1101, Disorderly Conduct, in relevant part, provides the following:

> (1) A person commits the offense of disorderly conduct if, with intent to cause physical inconvenience or alarm by a member or members of the public, or recklessly creating a risk thereof, the person:

(continued . . .)

At the August 2, 2011 arraignment, Harter requested a jury trial. The district court committed Harter for trial to the circuit court and scheduled arraignment before the circuit court on August 15, 2011.

## A.    Counsel Appointments and Trial Scheduling

Harter appeared in custody for arraignment, and the circuit court set trial call for September 26, 2011, and trial for October 3, 2011.[4] The Office of the Public Defender was appointed as Harter's counsel.

The trial week was continued to November 14, 2011,[5] and trial call was later rescheduled to December 5, 2011.

On December 5, 2011, the circuit court granted Harter's request for a continuance because the State was unable to produce requested police reports and defense counsel indicated the defense's intent to subpoena these documents from the Honolulu Police Department (HPD). However, at the next scheduled trial date on January 23, 2012, Harter's deputy public defender informed the circuit court that Harter asked him to

---

(continued . . .)

       . . .
       (c) Subjects another person to offensively coarse behavior or abusive language which is likely to provoke a violent response . . . .

[4]    Harter did not appear at the initial arraignment date.

[5]    The Honorable Edward H. Kubo, Jr., presided over the circuit court proceedings in this case.

withdraw as counsel.  Harter explained to the court that she was unsatisfied with her counsel.[6]  The circuit court granted the motion to withdraw and set a new trial week for February 21, 2011.  Te-Hina Ickes was appointed as Harter's new counsel.

Following Ickes' appointment, Harter's trial was continued on four other occasions—twice by stipulation and once by Harter—until July 30, 2012.  The last continuance was due to the State not being prepared to proceed to trial because the complaining witness was on military leave.  Ickes objected to the State's request and asserted the defense was prepared to proceed to trial.  The court indicated this was the "fourth time that the State [was] not ready to proceed," but the court granted the State's oral motion for a continuance and set the new trial date for August 13, 2012.

**B.  Ickes' Motion to Withdraw**

On August 13, 2012, in a hearing before the circuit court, Ickes made an oral motion to withdraw as counsel:

> I've just been informed by Ms. Harter prior to coming into court today that [she is] unhappy with my services and would like me to withdraw . . . I don't know if your Honor needs to hear any more from me.  It's Ms. Harter that's – that's taken issue with my representation.

---

[6]    Specifically, Harter complained that she was unable to schedule an appointment although she "tried and tried."  She also noted that when she finally did meet with her public defender that he told her, "You're crazy," after she told him that she had "a new job as an MTV assistant casting director."  Harter also claimed that her public defender would "put [her] down" and "negat[e] every single thing" she asked him to do.

The circuit court responded by noting Ickes' level of preparation and that Ickes had been Harter's counsel for over six months.

The circuit court posited that Ickes had met with Harter "several times" at Ickes' office. Ickes, however, indicated she only had one scheduled meeting with Harter that lasted an hour and five minutes on March 8th and their "other discussions happened over the phone and before and following court." The circuit court also stated it was familiar with Ickes' work and diligence in her investigation including locating a witness on the mainland. Ickes responded, "Judge, actually, that never panned out. I did attempt calls and writing, but that never turned into anything."

The circuit court then verified with the State that there were less than thirty pages of discovery. The prosecutor indicated there was also a CD that included a 911 call. Ickes related that, upon reviewing the discovery, she did not have any record of having ever received the CD from the prosecutor's office.

In elaborating on her reasons in support of her motion to withdraw as counsel, Ickes stated Harter was "unhappy" with Ickes' representation. Ickes listed some of Harter's complaints about Ickes: she was "not prepared"; she was "not paying enough

attention to her case"; she did not return Harter's phone calls; and she did not have "enough time to prepare to begin with trial tomorrow." Ickes explained:

> I think . . . she just feels like I'm not prepared . . . to proceed in her defense. And, you know, any implications of me being ineffective, <u>if she's unhappy with how I conduct myself during the trial</u>, if how I conducted myself in preparing for her trial, you know, <u>that goes to my credibility as a lawyer</u>, and it's -- it -- I apologize, Judge, I'm not exactly sure how to frame this, but <u>essentially she's unhappy with my representation</u>, and she does not want me to represent her anymore. She has indicated to me that she has consulted another attorney, but in effect has used the words that I want to fire you right before this hearing.

(Emphases added). Ickes also suggested withdrawal was necessary for her own professional interest, to protect herself from subsequent claims of ineffective assistance of counsel, and to secure Harter's right to effective assistance of counsel:

> So for those reasons, Judge, <u>for my professional stake in this</u>, and <u>for Ms. Harter's well-being</u> -- I mean, she is facing these criminal charges, and <u>she is entitled to effective assistance of counsel</u>. <u>If I feel like perhaps there might be some later allegations of me being ineffective, me neglecting her, I certainly need to protect myself</u>. So for those reasons, your Honor, . . . I feel like I . . . need to make this motion to withdraw and assure the Court that <u>it's not any strategy on my part to try and, you know, waste this Court's time</u> and push this case any further back than it needs to go.

(Emphases added).

The circuit court responded that it was aware of Ickes' reputation for honesty and integrity and commended Ickes for being a "hard working attorney." The court noted that just because attorneys do not contact their client, the complainant,

7

or other witnesses, it does not necessarily mean they "are incapable of performing outstandingly at time of trial." The court stated that it did "not doubt" Ickes was prepared for trial, noting she declared she was ready on July 16th. The circuit court emphasized it was taking Ickes at her word and also "based on her reputation for honesty and integrity within our court system." The court stated it was "not inclined" to allow Ickes to withdraw at "this late date." In response, Ickes continued to describe her inability to communicate with Harter as a basis for her oral motion to withdraw:

> [A]nother reason I think it might impede Ms. Harter's right to a fair trial is that there's that communication breakdown between the two of us. She doesn't -- I believe she no longer trusts me . . . It's really going to impede my ability to prepare her or advise her regarding her potential or her rights to testify in her own defense . . . my ability to actually sit down with her and prepare for potential cross-examination . . . I think that would infringe on her right to a fair trial . . . if she doesn't trust me . . . .

(Emphases added).

Harter addressed the court and stated her reasons for requesting Ickes' withdrawal:

> I've only had one meeting with her, and every month multiple times a month I've asked to schedule another meeting just to know what's been going on with my case, if anything. Because before we had nothing, . . . I told her what had happened and how I didn't have any understanding of what was going on.
>
> . . . And like I've said, I've never been contacted whatsoever about my case, and I've just asked for any knowledge or a meeting or anything.

8

(Emphases added). Harter then discussed the periods of trial delays:

> This case has been going on almost two years. I've never waived the Rule 48. . . . I've been here every single time on time. There was one where I was like an hour late, and then it was rescheduled. And for that I had a bench warrant, and I was in jail for two months when my court date was scheduled one day later. And I never did anything.

The court asked the prosecutor for his Rule 48 calculation.[7] After obtaining an expiration date of September 27, 2012, the court indicated it would do its own calculation and instructed defense counsel to also do a recalculation.

The court noted that a jury had already been ordered and re-affirmed its determination that Harter would be able to prepare for trial with her counsel "in the little time" she had left because there were "only a few pages of discovery." The circuit court concluded the hearing by stating that it wanted Ickes and Harter to "talk outside":

> It is my belief that a <u>jury on this case has already been ordered</u> for this trial. I believe that . . . because she's one of the better ones that we have in town, <u>that you can</u> work together and prepare for this in the little time you have left between now because it's only a few pages of discovery that we're really talking about, and it's from multiple sources. . . .
>
> . . .
> . . . <u>So this case will proceed tomorrow. I want both of you -- you and your attorney to talk outside</u>, and tomorrow

---

[7] Rule 48 refers to Hawai'i Rules of Penal Procedure Rule 48, which sets forth a six-month period for trial to commence after a prescribed event has occurred and also establishes excludable periods for purpose of time computation.

> morning at 8:30 I want you guys back here for further status hearing.

(Emphases added).

At the beginning of the status hearing the next morning, the circuit court inquired into whether Harter followed the court's "order" to talk to her attorney "as soon as court was completed." During the course of this exchange, Harter indicated she did not meet with Ickes:

> THE COURT: Ms. Harter, please stand. The Court yesterday ordered you to talk to your attorney as soon as court was completed . . . yesterday. Did you do so?
>
> HARTER: No.
>
> COURT: Why not?
>
> HARTER: I didn't hear you say that I needed to talk to my attorney.
>
> THE COURT: I made myself very clear yesterday to you.
>
> HARTER: I didn't hear it. It was not very clear to me.

Harter was apparently speaking loudly, and the court informed her to lower her voice, warned her about interrupting the court, and directed her to follow the instructions of the court.

The court resumed its inquiry into Harter's failure to follow its order to meet with her attorney. Harter tried to explain she had gone to the Office of Disciplinary Counsel:

> THE COURT: Okay. Now, when the Court orders you to do something, you do it. I've been notified now by you that you did not stay around to meet with your attorney.
>
> HARTER: I went to the Office of Disciplinary Counsel.
>
> THE COURT: I didn't ask you why. I didn't ask you why. Today, when you arrived, did you talk to your attorney?

HARTER: Yes.

THE COURT: Okay. And what was the results of that conversation?

HARTER: I had already pled not guilty, and she wanted to know if I'd change my plea to say no contest, that there would be some kind of deal arranged. But then she said that there would be no way to appeal or address this case in any way, and there's already an investigator on this case from yesterday. And he said it's a hate crime. To get another lawyer because it's a hate crime.

THE COURT: Who said it's a hate crime?

HARTER: The other investigator because the people -- when all the police showed up and stuff, they were saying that I was a white haole bitch and a tourist, and when -- as soon as I told them I had lived here for 16 years, that's when the courts actually let me out of jail three days later.

THE COURT: Okay.

HARTER: Because they thought I was a tourist the whole time.

(Emphases added). The circuit court then asked Harter about the status of her relationship with Ickes and also evaluated the level of preparation required for the case:

THE COURT: What's the current status of your employment with your attorney?

HARTER: I don't know what you're asking.

THE COURT: Well, I can tell you that she has done her homework. She has represented to the Court that she did get the discovery. She has reviewed the discovery.

By the way, the Court will obtain a copy of the police reports and seal it so that any appellate court reviewing this matter will know how small the discovery is, and my guesstimate is that only nine pages of substance are actually typewritten of which it's divided between three witnesses who saw the same thing. And so you're only really talking about three – three pages of police report of really true substance about the facts of this case.

I would determine that going over that police report, analyzing it is a matter of an hour, maybe two hours of which the defense attorney has indicated to the Court that it has. Defense attorney on behalf of you declared ready

11

> which told the Court that she was ready for trial and able
> to represent you at trial on June 16th of this year.

(Emphases added).  The circuit court stated that it understood

the "sole or the focal" reason Harter was not able to work with

her counsel was because Ickes did not return Harter's phone

calls the previous week.  Harter responded that the problem had

started much earlier:

> Actually, since the very beginning I had one meeting with
> her, and every -- at least every month to every two weeks I
> was giving her a call saying that I needed her to call me.
> I needed to set up another interview or meeting of some
> sort.  I have papers to give you.  If you could give me a
> call back or send me an e-mail, anything.  I never once
> received a phone call or an e-mail or any of the sort, and
> I've left messages with her office . . .

(Emphases added).

The court questioned why Harter had not raised these

concerns about Ickes' "unresponsiveness" at the previous court

hearing.

> THE COURT: My question to you is on July 16th, the last
> time you appeared, when you heard your attorney declare
> that you guys were ready for trial, how come you didn't
> bring that up at that time?
>
> HARTER: I was never addressed in court. I just would stand
> here and not say anything this whole time. And now that
> I've started to say something, I've been threatened with
> the sheriff.[8]
>
> THE COURT: So you -- so you're -- all of a sudden you're –
> you're saying something?  I mean, it would have appeared to
> me that when you appeared to me on February, in April, in
> May, in -- in July, you should have said something to me at
> that time.

_____

[8]     At one point Ickes told Harter not to interrupt the circuit court
judge, warning her, "He's going to call the sheriff."

> HARTER: From April until now, we were still waiting to hear back from the Honolulu Police Commission because my report was never put into the paperwork as part of the police reports, which is what I was trying to do. And it's been 5 1/2 months instead of six weeks, which is -- is as long as it takes.

(Emphases added).

The court concluded its colloquy by asking Harter if she could work with Ickes, and Harter's response related to not having been asked about waiving Rule 48.

> THE COURT: Well, this case has been hanging around long enough, and I'm not going to let any more cobwebs collect on this case.
> Is it your determination that you can work with your attorney?
>
> HARTER: Well, also before when the -- I guess the Rule 48 was waived, I was never asked if I wanted to waive the Rule 48. Like, again, I was never addressed and asked that question. Just like everybody else has been asked since I've been sitting here all this time, I was never asked if that was okay.

(Emphases added). The court did not inquire further into whether Harter believed that she could work with Ickes as her counsel.

The circuit court then explained its analysis of Harter's motion to substitute counsel under a four-prong test for substitution of counsel from United States v. Doe, 272 F.3d 116 (2nd Cir. 2001). As to the first factor, "whether Defendant made a timely motion requesting new counsel," the court found the motion was untimely given that it was "the eve of trial." Second, the circuit court found that it "adequately inquired into the matter" because it "did a searching and probing inquiry

13

into the defendant." During the court's discussion of the third factor, "whether the conflict between the defendant and her attorney was so great that it resulted . . . in a total lack of communication preventing an adequate defense," Harter interjected that "there was such a lack of communication" that she "didn't even know it was the eve of trial." With respect to the fourth prong, the court found Harter was responsible for the breakdown in communication, noting that Harter had not met with her counsel the previous day as required and that earlier that morning Harter's voice was "enraged" at her counsel:

> THE COURT: Okay. Well, then the fourth factor is whether the defendant substantially and unjustifiably contributed to the breakdown in the communication, and I also find that. When the Court ordered you to -- to talk to your attorney yesterday, and you walked out of here and kept on going despite the fact that the Court told you to talk to your attorney –
>
> HARTER: I didn't hear it. I just told you that.
>
> THE COURT: -- and yesterday I told you to be back at 8:30 and you didn't. And now I find out that -- that you were outside with -- with your voice enraged at your attorney. You don't do that.
>
> HARTER: No, she was yelling at me. I wasn't yelling at her.
>
> THE COURT: . . . [I]t doesn't matter. When this arguments happen like this, you know, I -- yesterday when you left here, you were responsible for the breakdown, and I think the record is quite clear from my colloquy with you that, you know, a relationship as far as an attorney-client relationship with you need to understand cannot be one-sided.

(Emphases added).

The circuit court concluded Ickes was properly prepared to represent Harter. The court ruled that it did not

14

find "good grounds" to discharge Ickes and consequently required Harter to choose between two options: "either . . . keep" Ickes, or "proceed to trial this morning by yourself." The court explained to Harter that the question was whether her attorney is properly prepared to go to trial, and the court found "yes" that Ickes was "ample and ready" to defend Harter's interests "zealously." The circuit court emphasized to Harter that she was entitled to counsel only if the court were to find "good cause" to discharge Ickes. The court further explained that since there was "no valid reason for the discharge" the court was "not required to appoint substitute counsel" to represent her, and if she continued to demand substitution, the court "may in its discretion discharge counsel and require the defendant to proceed to trial without representation." The court then asked Harter if she understood, and Harter was not responsive to the question:

> HARTER: I was call -- I was speaking to an attorney last night.
>
> THE COURT: That's not my question to you, young lady. Do you understand what I have told you?
>
> HARTER: Not really.
>
> THE COURT: Okay. Let me break it down for you. If I find that there is good grounds for you to fire your attorney and if I find that there is no valid reason for discharging your attorney, and I'm finding that, I have to advise you that either you're going to keep her, or you're going to proceed to trial this morning by yourself.
>
> HARTER: I don't wanna go by myself.

> THE COURT: Then you are obligated to talk to her.
>
> HARTER: I was trying to.
>
> THE COURT:  Okay. Then I will give you that opportunity. This Court will be in recess for half an hour. Call downstairs and subject to call, which means that I may call this case earlier.
> Counsel for defense, actually . . . I want you to be back . . . in your seats in 20 minutes.
>
> ...
> Okay. You may go outside and confer about this case.  If the defendant still wishes to have you represent her, I will keep you.  If she doesn't, . . . I will take the proper steps.
> ...
> And she will go to trial alone, by herself, without an attorney, but we're going to trial this morning.

(Emphases added).

After the parties returned from the recess and the court resumed the proceedings, the court noted communication between Harter and Ickes was "at least opened" and they were communicating.[9]

## C.  Trial

After the jury was released for the day on the first day of trial, the court cautioned Harter about the manner in which she spoke to her counsel during Ickes' cross-examination of Officer Gonzales because of its negative effect upon the jury:

> THE COURT: . . . I know that you're – you're zealous in what you're doing. But whenever you stand up, the – the

---

[9]    Similarly, after the Tachibana advisory, following voir dire, and after the jury was sent to deliberate, the court noted that Harter was communicating with Ickes.  Neither Harter nor her counsel specifically responded to the court's statements.

> jury stops listening to what your attorney is saying, and they start looking at you. And so you don't want to distract the jury from what your attorney is trying to accomplish.
>
> And number two, it's important that whatever you tell your attorney is in confidence, and <u>when you speak louder than what is normal</u>, the prosecutors can hear, and you don't want your opponents to hear what you're saying. And so I ask that you tone down -- you know, just have the conversation between you and your attorney. I've been using this white noise to -- to keep -- you know, to at least do the static noise to keep your conversation with your attorney as private as can, but just know that whatever you say, if you say it a little louder than normal, the other side will hear, and you don't want that. Okay.

(Emphases added). While the court was discussing jury instructions, Harter said she "actually believe[d]" this was a "case of mistaken identity," and she asked the court for advice about bringing a witness to testify. The court responded, "That's one of the things you need to talk to your attorney."

The next day, on direct examination, Harter described her employment as a "dancer and a hostess" at a nightclub called Femme Nu. Harter indicated she was also starting a "modeling agency" for charity "with them as [her] sponsor."

Harter testified that on April 30, 2011, she worked at Femme Nu until about 10:00 p.m. She and several friends decided to go to Club 939 because Harter was interested in applying for a job there. While at Club 939, she bought drinks for her friends, and she drank two "pineapple and vodka[s]."

Harter testified that she obtained a job application and went to grab a chair to sit down. She stated that a bouncer

approached her and "want[ed] [her] to move away from the pole on the ground." The bouncer "pat[ted] [her] back," and Harter told the bouncer that "it hurt" when he did that. Harter claimed that the bouncer was "seven feet tall and 500 pounds" and that the bouncer's "patting" caused her "crippling pain" that "hurt to [her] fingertips and . . . toes." Harter stated she "was in shock because of how bad it hurt," because she "hadn't been touched for about six months" having just gotten out of an engagement. Harter later acknowledged that her description of the bouncer was "an exaggeration" and that "he was a very big bouncer."

Harter testified that after she told the bouncer his pat on her back hurt her, "he did it again as [she] was bending over to grab a chair." She claimed the bouncer grabbed both of her wrists, "dangle[d]" her, and called her a "whore." The bouncer, she said, then pushed her into the lobby. At some point, Harter called 911 because she wanted to "file a report" regarding the alleged attack.

Several officers testified that on May 1, 2011, they responded to an incident at Club 939 between Harter and a bouncer. Officer Vincent Gonzales, the complainant in the assault charge, testified that during the course of trying to control the situation, Harter became unruly and pushed him in

the chest, swung her arm, pulled at his shirt, and "unfortunately" scratched his chin causing him to bleed. Only Officer Gonzales testified that Harter scratched him; the other three responding officers testified that they did not witness Harter scratch Officer Gonzales.

Harter's testimony regarding the incident was sometimes disjointed and bizarre. Harter claimed Officer Gonzales was not present during the incident and that all the officers who had testified, with the exception of Officer Uno, were "stand-ins" who had the case confused with another incident that happened with a different girl.

Harter described the arrest as follows: "[T]hey had me pinned on the ground . . . He's laughing that I'm resisting . . . my shirt is completely off. My pants are falling down . . . I was completely exposed in front of 40-plus people in front of 939." Harter claimed her shoulder hurt for over a month. Harter also stated she thought she "might be shorter" because her calves and feet had "been in pain." Harter elaborated, "My muscles are contracted instead of relaxed, so it puts pressure on my height and my bones and stuff."

Harter insisted that she was not arrested by Officer Gonzales, but instead, that she was arrested by an unidentified, "very short," "old man" who had "gray hair and a mustache" and

was looking at her "like, just adoring." When asked how she was behaving prior to her arrest, Harter stated, "[T]he old man . . . he was talking to me, and he . . . wanted to see how I talked . . . . I don't know how to explain it, like -- because I was out with a pro surfer that night. It was like our first -- one of our first nights out, and I was getting a job, like I was pretty well-behaved."

Harter further testified that the old man who arrested her claimed that he could do whatever he wanted and stated, "We run these streets." Harter described her response:

> Waikiki is not the streets. It's one of the top ten tourist destinations of the world. And at that point, the crowd gets up – riled up, like, yeah, and they start cheering. And so he feels that there's -- they -- they're starting to put themselves and separate the officer from me, because for ten minutes of this conversation, he was walking around me in a circle and talking to me and seeing, like, what I would say and how I was responding to it.

## D.  Verdict and Sentencing

The jury found Harter guilty of the three charges. After the verdict was taken, Ickes made a Motion for Judgment Notwithstanding the Verdict (Motion for JNOV). The court did not require preparation of a pre-sentence diagnosis and report for sentencing.

At the October 11, 2012 sentencing hearing, the court denied Harter's Motion for JNOV. Harter was in custody because she failed to appear for argument on the Motion for JNOV on August 16, 2012. The State requested that Harter be given the

maximum one-year sentence for the misdemeanor offenses. In her sentencing argument, Ickes noted that Harter had no prior arrests or convictions. Ickes argued that Harter was "likely to respond affirmatively to a probationary period and perhaps even with a special condition that she obtain and complete mental health treatment."

When Harter had an opportunity to address the court, her statements were disoriented and at times appeared irrational. Harter explained that her absence from the original sentencing hearing was because she was "talking with . . . the FBI and other investigators," and she "had to miss meetings because of the apprehension on Pearl Harbor, because somebody stole her phone." Harter claimed to have information from a Supreme Court Justice that Officer Gonzales was involved in a different incident, and she also stated that she had records to prove she was not intoxicated during the incident. Harter addressed the court as follows:

> MS. ICKES: . . . Do you want to say anything to the judge?
>
> HARTER: Well, yeah, I also had written a letter that I used to have like $20 million, and I just lost my family and my fiancé. And during this, I had lost three businesses, I believe, because I had to stop and participate in the case and the things that I had to stop doing for my businesses.
>
> And, yeah, I think that there's definitely been a lot of stress. I would like to get some mental health done. But I don't think that I need to be in captivity anymore, because I've -- I always do everything that I think is right. And this was definitely . . . a misunderstanding.
> . . . .

THE COURT: Is there anything else you think I should know? Because you still haven't answered my question.

HARTER: What was your question?

THE COURT: How come you didn't show up for sentencing the next day?

HARTER: Because I felt that I didn't need to be sentenced, that it was so absurd that everything that I went through, I never even got to finish my statement. I -- and the three guys weren't even there the night that I was there. It was a completely mistaken identity.

I -- so I was going to show up, but I was so freaked out, like I went and -- I was -- I even got ready for court and everything, and I just couldn't do it, like I thought it was so crazy. And I was terrified that something bad was going to happen to me.

Because even the judge before at District Court was threatening me when I just walked in, before I even -- we never even had trial. It was just the first preliminary where I met my public defender and everything. And he, like, screamed over everybody that was in the court and said, I'm going to fry you, da, da, da. I'm pushing it to the limit. You're going to be in jail for three years, da, da, da. And I was like, I'm -- I'm going to go to trial, because this is so crazy.

So I've been so freaked out because of all of this. And everyone's been so rough on me, when I tried to get help because I was sexually assaulted, and my -- it was a foot and a half away from my boyfriend the whole time.

And then they -- they -- the police had – got my Alabama ID when I called, and they're like, ho, she's not even from Hawaii, like, we're this -- they even said they're a gang, like they're doing all this stuff to me.

And then when they found out that I was from Hawaii, then I was out last time in three days. So they thought that I was a tourist this whole time. That's -- that was, like, their goal. And they thought I was a rich tourist, which turned out, no, I'm somebody who's local.

I'm trying to do everything. I've been trying to go to -- I want to go to school and have that done by Christmas. And like I said, I already have plans to be a missionary, and anyone would -- could vouch for that, I guess. . . .

(Emphases added).  The court then imposed the maximum one-year jail term in counts 1 and 2, and thirty days in count 3, with terms to run concurrently with one another.

After the circuit court sentenced Harter, Ickes orally renewed her motion to withdraw and asked the court whether she should reargue the points that she had made in her previous motion to withdraw as counsel before trial.  The circuit court granted the motion to withdraw without Ickes stating any reason for the motion other than Harter wished to appeal:

> MS. ICKES:  Your Honor, may I address the Court briefly --
>
> THE COURT:  Yes.
>
> MS. ICKES:  -- on one additional matter?  The Court is well aware of the history of this case and my appearances.  I had attempted to withdraw prior to trial.  Did the trial. Appeared this morning for the motion and the sentencing. In light of my previous arguments -- I don't know if the Court wants me to -- to reargue those points?
>
> THE COURT:  No, just make the motion.
>
> MS. ICKES:  But I am -- I am renewing my motion to withdraw as counsel and also asking that if new counsel can be appointed for Ms. Harter.  She's indicated that she wants to pursue an appeal.
> . . .
> THE COURT:  Okay.  Your motion is granted, then.  A new attorney will be appointed for her.

The hearing then concluded with Harter asking whether she had jail time to serve and requesting to go to the state hospital.

> HARTER:  I have questions.  So do I have jail time to serve?
>
> THE COURT:  Your new attorney will -- will discuss that with you.  This matter's concluded.
>
> HARTER:  I also wanted to --

THE LAW CLERK:  All rise.

HARTER:  -- ask to go to state hospital, sir.

On October 11, 2012, the circuit court filed the judgment of conviction.  The court filed an Order Appointing Counsel on October 12, 2012, which stated that the court found good cause for appointment of substitute counsel.

E.    Harter's Motion to Reconsider Sentence

On December 19, 2012, Harter, through her newly appointed counsel, filed a Motion to Reconsider Sentence.  In her motion, Harter made the following arguments: (1) the sentence imposed was "excessive in light of her record"; (2) although a pre-sentence investigation was neither requested nor ordered, such an investigation would have shown that it was "apparent" that she had "mental health concerns"; (3) Harter's mental health concerns were not being addressed in the Oʻahu Community Correctional Center; and (4) Harter had applied to the Poʻailani dual-diagnosis treatment program and Hoʻomau Ke Ola dual-diagnosis treatment program and was awaiting an assessment. The motion to reconsider was denied.[10]

---

[10]    The court was informed during oral argument that Harter served the entire one-year sentence.  MP3: Oral Argument Before the Hawaiʻi Supreme Court, No. SCWC-12-0000962 Thursday, August 7, 2014, 8:45 a.m., available at http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc_scwc_12_962.html.

On January 11, 2013, Harter filed a Notice of Appeal from the judgment of conviction.

## F.   Intermediate Court of Appeals

### 1. Opening Brief

In her first point of error on appeal to the ICA, Harter contended that the circuit court abused its discretion in denying the motion for withdrawal and substitution of counsel. The circuit court, Harter argued, did not conduct a "penetrating and comprehensive examination" to "determine the nature and extent" of the issues that had arisen between Harter and her counsel, as required by State v. Soares, 81 Hawai'i 332, 916 P.2d 1233, (App. 1996), overruled by State v. Janto, 92 Hawai'i 19, 986 P.2d 306 (1999).  Instead, the court "focused on its own belief that the case was relatively simple, that a jury panel had already been ordered and its own perception that Ickes was a 'hard working attorney' and 'one of the better [attorneys] that we have in town.'"  (Alteration in original).  Harter contended the circuit court applied a "mechanical test" developed by the Second Circuit Court of Appeals "in direct contravention of the ICA's holding in Soares" requiring that each case be "evaluated on its particular circumstance."  (Citing Soares, 81 Hawai'i at 355, 916 P.2d at 1256).

25

In support of her second point of error, Harter argued that under HRS §§ 704-403[11] and 704-404,[12] the circuit court erred by failing to, sua sponte, suspend the proceedings in order to conduct an evidentiary hearing on Harter's competence to stand trial because there were "sufficient indicators . . . to raise a good faith doubt as to her competence to stand trial." Harter contended Soares requires "[g]enuine doubt, not a synthetic or constructive doubt" as to "competence." (Quoting Soares, 81 Hawai'i at 348, 916 P.2d at 1249). She also maintained that her mental condition clearly "affected her ability to assist in her

---

[11]    HRS § 704-403 (1993), provides, in relevant part the following:

> No person who as a result of physical or mental disease, disorder, or defeat lacks capacity to understand the proceedings against the person or to assist in the person's own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

[12]    Pursuant to HRS § 704-404(1) (Supp. 2012),

> [If] there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. If a trial jury has been empanelled, it shall be discharged or retained at the discretion of the court. The discharge of the trial jury shall not be a bar to further prosecution.

Pursuant to HRS § 704-404(2), after suspending the proceedings, the court must then appoint "one qualified examiner in nonfelony cases to examine and report upon the physical and mental condition of the defendant."

defense," while her bizarre statements during trial affected her credibility with the jury.[13]

### 2. Answering Brief

In its Answering Brief, the State maintained the circuit court did not abuse its broad discretion in denying Harter's motion for withdrawal and substitution of counsel. The State argued Harter's allegation that Ickes was not spending enough time on her case was "a far cry" from the Soares requirement of "a complete breakdown in communication or irreconcilable conflict between a defendant and his or her counsel which leads to an apparently unjust verdict." The State further argued that any breakdown in communication was "easily resolved" by the circuit court's "urging and ordering Harter to communicate with Ickes." The State concluded that "because the withdrawal request was made on the eve of trial and the communication problem between Harter and Ickes was resolved prior to trial," there was no good cause to substitute court-appointed counsel.

In regard to the second point of error, the State argued Harter was fit to stand trial because she met the requirements set forth in Janto, 92 Hawai'i 19, 986 P.2d 306:

---

[13]     Harter also argued Ickes' failure to object to an officer's testimony that he believed Harter was on drugs constituted ineffective assistance of counsel.

"[A] defendant must (1) understand the proceedings against her, (2) be able to assist in her defense . . . in accordance with state and federal constitutional due process concerns, [and] (3) have the ability to consult with counsel."

The State argued that the record reflects Harter "understood the proceedings against her, consulted with counsel, and assisted in her defense." The State maintained that Harter "had a flair for drama and exaggerated often during her conversations with the court" and that she was simply "eccentric, quirky, even fragile" but "was nonetheless able to follow the court's and counsel's directions and responded appropriately."[14]

### 3. ICA Memorandum Opinion

In its Memorandum Opinion, the ICA affirmed the circuit court's judgment of conviction. First, the ICA held the circuit court did not abuse its discretion in denying Harter's motion for withdrawal and substitution of counsel. The ICA found the circuit court "thoroughly examined the basis for Harter's request, counsel's readiness for trial, and other facts and circumstances, including that the request was made on the

---

[14] In her reply brief, Harter reiterated that the circuit court "placed undue emphasis on its perception of Ickes' reputation and its perceived simplicity of the case," while ignoring the apparent strained relationship between Harter and Ickes. In support of her second point of error, Harter emphasized that her irregular conduct and statements affected her ability to present a defense.

eve of trial, a month after defense counsel confirmed her readiness to proceed to trial." The ICA also noted the circuit court "engaged in an in-depth dialogue with both Harter and her appointed counsel."

As to Harter's second point of error, the ICA found it could not conclude that the circuit court "plainly erred in failing to sua sponte hold a competency hearing." The ICA noted that questions of fitness are "best resolved at the pretrial stage" and that the question of Harter's fitness "was not raised before or during trial." The ICA found a "significant issue" with the fact that there were no known prior medical opinions concerning Harter's mental health. It was also significant to the ICA's analysis that Ickes did not "raise any concern about Harter's ability to participate in her defense based on competence" since Ickes was in the "best position to observe Harter's ability to participate in her defense."

The ICA summarized the record as reflecting "a mixed bag of appropriate behavior, where Harter appear[ed] to sometimes understand even fine nuances and details of the proceedings, and inappropriate, irrational, and potentially self-defeating – and perhaps delusional – behavior and statements." The ICA proceeded to discuss some examples of Harter's bizarre behavior and comments and provided alternative

explanations for the behavior other than mental illness.  For example, the ICA commented that "Harter's rambling statement at sentencing—including wild assertions about having had $20 million dollars . . . and dating the son of a supreme court justice—could simply have reflected feeble attempts at avoiding imprisonment."  Although the ICA found Harter's behavior to be troubling at times, it ultimately found that given the record below, it could not conclude that the circuit court plainly erred in failing to <u>sua sponte</u> hold a competency hearing.

The ICA affirmed Harter's convictions without prejudice to her raising and further developing the issue of her fitness to stand trial in a HRPP Rule 40 petition for post-conviction relief.  The ICA also held that Harter should not be foreclosed from raising the fitness issue stemming from HRS § 704-402(1) in conjunction with her ineffective assistance of counsel contentions.[15]

## G.    Application for Writ of Certiorari

In her Application for Writ of Certiorari (Application), Harter presents the following questions pertinent to disposition of the Application:

---

[15]    The ICA denied Harter's argument that she received ineffective assistance of counsel without prejudice to her raising it in a HRPP Rule 40 petition.

> 1. Whether the ICA gravely erred in holding that the circuit court did not abuse its discretion in denying Harter's motion for withdrawal and substitution of counsel?
>
> 2. Whether the ICA gravely erred in holding that the circuit court did not abuse its discretion in failing to *sua sponte* hold a hearing to determine Harter's competence to stand trial?[16]

Harter argues the ICA gravely erred in upholding the circuit court's denial of her motion for withdrawal and substitution of counsel. Harter contends the circuit court failed to conduct a "penetrating and comprehensive" examination as required by Soares, 81 Hawai'i 332, 916 P.2d 1233, in determining the motion. Instead of applying Soares, Harter asserts the circuit court incorrectly applied a Second Circuit standard in "direct contravention" to Soares, and in doing so, the circuit court "failed to consider all of the particular circumstances of the case."

Harter further argues the circuit court placed too much significance on Ickes' competence as a lawyer and her ability to provide adequate representation. Harter contends the circuit court's finding that Ickes was a competent attorney did not mitigate the problems with the attorney-client relationship. Harter also claims the "court blithely ignored" Ickes' admissions regarding their issues with communication and trust.

---

[16] In her Application Harter also raises her ineffective assistance of counsel claim that she raised to the ICA. We do not address the competency of counsel in this case.

Because the circuit court did not conduct the required inquiry, Harter concludes the circuit court "could not properly determine whether there was good cause to warrant substitution of counsel."

As to the second issue presented, Harter argues the ICA should have found that the circuit court abused its discretion in failing to sua sponte hold a hearing to determine Harter's competence to stand trial. Harter asserts that her conduct and statements made throughout the proceedings "raised a good faith doubt as to her competence to stand trial." Harter points to numerous "bizarre statements" she made during the proceedings. Harter maintains her mental condition and "bizarre statements" not only "affected her credibility, but also, "clearly" affected her ability to meaningfully assist in her own defense.

## II. DISCUSSION

### A. Substitution of Court-Appointed Counsel

"In our system of law one of the most fundamental rights guaranteed to an individual charged with crime is the right to have the assistance of counsel for his [or her] defense." State v. Kane, 52 Haw. 484, 486, 479 P.2d 207, 208 (1971). This "guarantee of assistance of counsel will not be satisfied by the mere formal appointment of an attorney," and

thus, the trial court has an ongoing duty to ensure that the right to the assistance of counsel is not an "illusory guarantee."  Id. at 486, 479 P.2d at 209.

Although "there is no absolute right, constitutional or otherwise, for an indigent to have the court order a change in court-appointed counsel," State v. Torres, 54 Haw. 502, 504, 510 P.2d 494, 496 (1973), when an indigent defendant requests that appointed counsel be replaced, the "trial court has a duty to conduct a 'penetrating and comprehensive examination'" of the defendant on the record, in order to ascertain the bases for the defendant's request."  Soares, 81 Hawai'i at 355, 916 P.2d at 1256 (quoting Kane, 52 Haw. at 487-88, 479 P.2d at 209); see also Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991). This "inquiry is necessary to protect the defendant's right to effective representation of counsel," Soares, 81 Hawai'i at 355, 916 P.2d at 1256 (quoting Kane, 52 Haw. at 487-88, 479 P.2d at 209), and it must be "the kind of inquiry that might ease the defendant's dissatisfaction, distrust, or concern," Lockhart, 923 F.2d at 1320; United States v. Garcia, 924 F.2d 925, 926 (9th Cir. 1991).

The trial court's inquiry must also be sufficient to enable the court to determine if there is "good cause" to warrant substitution of counsel.  Soares, 81 Hawai'i at 355, 916

33

P.2d at 1256. Whether there is "good cause" requiring substitution of counsel will depend on the facts of the case. Typically, "good cause" exists when there is a conflict of interest on the part of defense counsel, a complete breakdown in communication between the attorney and client, or an irreconcilable difference between the attorney and client. See, e.g., id. at 355, 916 P.2d at 1256 (collecting cases).

1. Conflict of Interest Grounds

a. Trial Court Duty to Inquire

A trial judge is required to conduct a "penetrating and comprehensive" inquiry when he or she "reasonably should know" that a conflict of interest exists. Cuyler v. Sullivan, 446 U.S. 335, 347 (1980). Once this duty to inquire is triggered, "it cannot be discharged by a perfunctory inquiry," but rather, the duty is only met with "probing and specific questions" about the potential conflict. See Wayne R. LaFave et al., Criminal Procedure § 11.9(b)(3d ed.) (quoting Atley v. Ault, 21 F. Supp. 2d 949 (S.D. Iowa 1998), aff'd, 191 F.3d 865 (8th Cir. 1999)).

This strict requirement imposed upon trial courts to inquire into a potential conflict of interest is consistent with the long recognized principle "that the Sixth Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties."

Lockhart, 923 F.2d at 1320.  Generally, "a conflict exists when an attorney is placed in a situation conducive to divided loyalties, and can include situations in which the caliber of an attorney's services may be substantially diluted."  Id. (citations and internal quotation marks omitted).  Our decision in State v. Richie, 88 Hawai'i 19, 41, 960 P.2d 1227, 1249 (1998), noted that concurrent representation of a defendant and an adverse witness is a "real conflict of interest" because such a situation is "inherently conducive to divided loyalties."

The Hawai'i Rules of Professional Conduct (HRPC) Rule 1.7 (1994) provides that a "lawyer shall not represent a client if the representation of that client may be materially limited by the . . . lawyer's own interests, unless (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation."[17]

---

[17]    Our analysis applies the 1994 HRAP Rule 1.7, which was in effect during the circuit court proceedings.  A new version of HRPC Rule 1.7 went into effect on January 1, 2014.  The revised rule provides that a "concurrent conflict of interest exists if: . . . there is a significant risk that the representation of [a] client[] will be materially limited . . . by a personal interest of the lawyer."  "Notwithstanding the existence of a concurrent conflict of interest. . . , a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to [the] client; (2) the representation is not prohibited by law; . . . and ([3]) [the] client gives consent after consultation, confirmed in writing."  HRAP Rule 1.7 (2014).

Comment 4 to HRPC Rule 1.7, regarding "Loyalty to a Client," describes how an actual conflict of interest may interfere with client representation:

> Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, <u>whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client</u>. Consideration should be given to whether the client wishes to accommodate the other interest involved.

HRPC Rule 1.7 cmt 4 (1994) (emphases added); <u>see also</u> HRPC Rule 1.7 cmt 8 (2014) ("Even where there is no adversity of interest, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.").

The possibility of a conflict of interest "does not itself preclude the representation," and Comment 4 provides that the "critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." HRPC

36

Rule 1.7 cmt 4 (1994); see also Fragiao v. State, 95 Hawai'i 9, 19, 18 P.3d 871, 881 (2001) (discussing HRPC Rule 1.7).

Therefore, a circuit court's "good cause" inquiry, when there is a potential conflict between the defendant and defense counsel's personal interests, should address whether the representation would be "conducive to divided loyalties." In light of the Hawai'i Rules of Professional Conduct's guidance on conflicts of interest, the court should consider asking questions regarding the following:

- the basis for the conflict of interest;

- the potential that the conflict would materially interfere with defense counsel's independent professional judgment in considering what actions to pursue on behalf of the client;

- the possibility that the conflict might foreclose defense counsel from taking courses of action that reasonably should be pursued on behalf of a client; and

- defense counsel's opinion on whether his or her representation would be adversely affected.[18]

If the court finds that there is an actual or potential conflict of interest, the court has an obligation to

_____

[18] The questions are based on HRPC Rule 1.7 and comment 4 to Rule 1.7. These same questions are also appropriate under the current version of HRPC Rule 1.7 and comment 8 to Rule 1.7.

disqualify the attorney or to explain the situation to the defendant and obtain a waiver if the defendant consents to the relationship.  See United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994) (describing the court's "disqualification/waiver" obligation for severe, minor, and potential conflicts); LaFave et al., supra, § 11.9(b).

The circuit court in this case was required to conduct an inquiry into the potential conflict of interest that was apparent during the pre-trial hearings on August 13 and 14, 2012.  While explaining her reasons in support of her motion to withdraw as counsel on August 13, Ickes emphasized that withdrawal was necessary for her professionally.  Ickes noted, "If I feel like perhaps there might be some later allegations of me being ineffective, me neglecting her, I certainly need to protect myself."  She assured the court that her motion was not strategic or intended to waste the court's time.

Nonetheless, in the colloquy that followed between the circuit court and Ickes, the court did not ask any questions probative of whether a conflict of interest did in fact exist between Ickes and Harter, whether such a conflict would adversely affect Ickes' performance, or whether Harter consented to the relationship.  Similarly, the court did not ask Harter any questions related to Ickes' potential conflict of interest.

Instead, the court determined that Ickes and Harter could "work together" and prepare for trial "in the little time" they had left because Ickes was "one of the better ones" and there were "only a few pages of discovery."

The following morning, the circuit court also did not address the question of whether Ickes had a conflict of interest with Harter, even though Harter explained that she left the courthouse quickly after the prior day's hearing to go to the Office of Disciplinary Counsel. The circuit court did not inquire into the circumstances of the potential conflict. When Harter tried to explain why she did not meet with Ickes, the court responded, "I didn't ask you why."

Although the circuit court did not inquire into Ickes' potential conflict of interest, the record indicates that a conflict of interest existed. Ickes explained that her personal interest of protecting herself professionally would jeopardize Harter's right to the effective assistance of counsel: "[F]or my professional stake in this, and for Ms. Harter's well-being -- I mean, she is facing these criminal charges, and she is entitled to effective assistance of counsel." Ickes emphasized that the potential of future allegations of ineffectiveness required her to protect herself, implicitly suggesting it could materially

affect her representation of Harter.[19]  The exchange between Ickes and the circuit court thus demonstrates that counsel believed her representation of Harter would be adversely affected by this conflict of interest.

Ickes' opinion regarding her ability to provide effective assistance of counsel should have been afforded significant consideration by the court because she was in the "best position" to determine whether her personal interest would interfere with the representation.  See Holloway v. Arkansas, 435 U.S. 475 (1978) (recognizing that an "attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial"); cf. State v. Scott, 131 Hawai'i 333, 345, 319 P.3d 252, 264 (2013) (finding that defense counsel was in the "best position to determine whether transcripts are necessary for an adequate defense").

In Holloway, the United States Supreme Court noted that defense attorneys have an obligation to advise the court of conflicts of interests, and as officers of the court, their declarations as to conflicts of interests are "virtually made

---

[19]    Ickes stated, "If I feel like perhaps there might be some later allegations of me being ineffective, me neglecting her, I certainly need to protect myself."

under oath." 435 U.S. at 486. Here, Ickes expressly assured the court that her motion was not strategic or intended to waste the court's time.[20] Thus, Ickes' concerns, expressed as an officer of the court, regarding her ability to provide effective representation should have been accorded careful consideration by the circuit court in an inquiry to determine whether an actual conflict existed.

In Douglas v. United States, 488 A.2d 121 (D.C. 1985), the D.C. Court of Appeals explained how a defense attorney's personal interest interferes with representation under similar circumstances to this case. The defendant in Douglas filed a complaint against his defense counsel with the Bar Counsel's Office, which led to the Bar Counsel launching an investigation into the defense attorney's conduct. Id. at 127-28.[21] The D.C. Court of Appeals noted that as soon as the defense counsel learned of the investigation of the defendant's complaint, "he acquired a personal interest in the way he conducted appellant's

---

[20] Harter stated, "I . . . need to make this motion to withdraw and assure the Court that it's not any strategy on my part to try and, you know, waste this Court's time."

[21] The defendant's complaint did not come to light until the second day of trial, when the defense counsel informed the court that he had just received a letter from the Office of Bar Counsel notifying him of the complaint and that the Bar Counsel was opening an inquiry into his conduct. Douglas v. United States, 488 A.2d 121, 128 (D.C. 1985). Even though the defendant and defense counsel indicated to the court that they wanted to go forward with the trial, the trial court declared a mistrial sua sponte. Id. at 129.

defense—an interest independent of, and in some respects in conflict with, appellant's interest in obtaining a judgment of acquittal." Id. at 137. For example, given a fear that the complaint would be expanded to include claims of ineffective assistance of counsel at trial, the defense attorney "would have an inordinate interest in conducting the defense in a manner calculated to minimize any opportunity for *post hoc* criticism of his efforts." Id. at 137.

Ickes was in a similar situation as the defense counsel in Douglas, and she even went so far as to tell the circuit court directly that she needed to "protect" herself because of the possibility of a future ineffective assistance of counsel claim. This concern was confirmed the next day when Harter told the court that she went to the Office of Disciplinary Counsel following the pre-trial hearing. Ickes' personal interest had the potential of seriously interfering with her "professional judgment about the best means of defending" Harter. Id. In light of the absence of a colloquy directed at ascertaining the risks, it cannot be discounted that defense counsel's personal interest could potentially have also influenced her strategic decisions or encouraged her to use an overly "conservative trial strategy." Id. Consequently, in the absence of any examination by the circuit court into the

underlying circumstances, the record in this case indicates there was a conflict of interest between Harter and Ickes. Therefore, "good cause" was demonstrated to grant the motion for withdrawal and substitution of counsel.[22]

### b. Ineffective Assistance of Counsel Due to a Conflict of Interest

We now consider whether the circuit court committed prejudicial error in denying Harter's motion for substitution of counsel. Under article I, section 14 of the Hawai'i Constitution, a defense counsel's representation is constitutionally ineffective where there is a relationship giving rise to a conflict of interest between the defense counsel and the client, and either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship. Richie, 88 Hawai'i at 44, 960 P.2d at 1252.[23]

---

[22] However, we note that "the filing, or the threat of filing, a disciplinary complaint [does] not create a per se conflict of interest" to establish good cause to substitute counsel. United States v. Rodriguez, 612 F.3d 1049, 1054 (8th Cir. 2010); see also Wayne R. LaFave et al., Criminal Procedure § 11.9(b) (3d ed.) ("[W]here counsel moves to withdaw on the basis of an alleged conflict other than that presented by multiple representation (e.g., defendant's filing of a disciplinary action against counsel), the court can more readily examine the underlying circumstances and refuse to permit withdrawal on the ground that it does not present an actual conflict.").

[23] "Any demonstrable adverse effect on counsel's performance is sufficient; actual prejudice is not required." Richie, 88 Hawai'i at 44, 960 P.2d at 1252.

However, we recognize that a defendant should not be required to show "adverse effect" in all cases in which the claim involves the right to counsel. This court has presumed prejudice where the trial court denied a request to substitute counsel with privately retained counsel. State v. Cramer, 129 Hawai'i 296, 303, 299 P.3d 756, 763 (2013). Relatedly, under the federal standard, "automatic reversal" is required where defense counsel is forced to represent codefendants over his or her timely objection, unless the trial court has determined that there is no conflict. Mickens v. Taylor, 535 U.S. 162, 168 (2002).

We note that a similar standard may also be warranted where defense counsel timely raises a conflict of interest based on a personal interest and the trial court fails to conduct any inquiry into the conflict. See Taylor v. State, 51 A.3d 655, 669 (Md. 2012) (finding that the same concern for prejudice in multiple representation cases is present in "personal interest attorney conflict cases where the attorney has created an adversarial relationship with his client by initiating a civil suit against the client during the course of representation"); LaFave et al., supra, § 11.4(b) n.37 (noting that "automatic reversal" may be appropriate where counsel informs the trial court that continued representation would not meet the standard

of effective assistance because of a complete breakdown in communications).  "The defendant's right to the effective representation of counsel necessarily imposes upon the trial judge a corollary duty to protect that right whenever its enjoyment appears to be in doubt."  Kane, 52 Haw. at 487, 479 P.2d at 209.

Thus, where there is a conflict of interest, such as when the defendant or defense counsel raises a conflicting personal interest, the trial court's failure to inquire into the conflict may amount to the deprivation of the defendant's right to effective assistance of counsel.  See Holloway, 435 U.S. at 484 (holding that the trial judge's failure "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel" amounted to a deprivation "of the guarantee of 'assistance of counsel'" where counsel raised concurrent conflict to the court).  It would be impractical to require a defendant to prove "adverse effect" in such a case.  See Cramer, 129 Hawai'i at 303, 299 P.3d at 763 ("[I]t is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings." (quoting United States v. Gonzalez-Lopez, 548 U.S. 140, 141 (2006)).  Additionally, appellate inquiry "into a claim

45

of harmless error" may require "unguided speculation," Holloway, 435 U.S. at 491.[24]

In this case, the circuit court was informed of a conflict of interest between counsel and the defendant, and the court did not conduct an inquiry into the conflict to support a finding that no actual conflict existed. Nonetheless, we need not decide whether a finding of prejudice is required in this case because the record demonstrates that the circuit court's denial of the motion to substitute counsel resulted in a denial of effective assistance of counsel. Assistance is ineffective where there is "(1) a relationship giving rise to a conflict of interest . . . between defense counsel and his/her clients; and (2) either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship." State v. Mark, 123 Hawai'i 205, 234, 231 P.3d 478, 507 (2010) (alteration in original) (quoting Richie, 88 Hawai'i at 44, 960 P.2d at 1252). As discussed, the record demonstrates a conflict of interest due to Ickes' personal interest in the case, and the circuit court did not elicit any information to the contrary.

---

[24] The Supreme Court in Holloway noted that "[i]t may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client." Holloway, 435 U.S. at 490. "And to assess the impact of a conflict of interest on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." Id.

Harter did not voluntarily consent to the relationship as required under our conflict of interest standard. Mark, 123 Hawai'i. at 234, 231 P.3d at 507. At the end of the August 14 pretrial hearing, the circuit court gave Harter a choice between two options: "either . . . keep [Ickes]," or "proceed to trial this morning by yourself." After Harter responded that she did not want to "go" by herself, the circuit court informed her that she was "then . . . obligated to talk to" Ickes. Thus, Harter was not given the opportunity to make an informed and knowledgeable decision to waive Ickes' conflict of interest, but instead, she was forced to choose between proceeding pro se or accepting Ickes as counsel. See State v. Dicks, 57 Haw. 46, 49, 549 P.2d 727, 730 (1976)("In determining the legal adequacy of waiver of counsel, the question is whether, considering the totality of the circumstances, the waiver was voluntarily and intelligently undertaken.").

Therefore, we hold the circuit court abused its discretion in denying Harter's motion for withdrawal and substitution of counsel.

2. Grounds Related to Breakdown in Communication or Irreconcilable Difference

Because we find the circuit court committed prejudicial error in denying Harter's motion for withdrawal and substitution of counsel based on Ickes' conflict of interest, it

is unnecessary to evaluate whether "good cause" existed due to a breakdown in the attorney-client relationship. However, in light of the frequency that this issue arises in our trial courts, we discuss the inquiry that applies under such circumstances.

Substitution of counsel is commonly requested when there is a breakdown in communication or there is an irreconcilable difference between a defendant and his or her counsel. See State v. Kossman, 101 Hawai'i 112, 120, 63 P.3d 420, 428 (App. 2003) (citing Soares, 81 Hawai'i at 355, 916 P.2d at 1256). Good cause for substitution of counsel exists under such circumstances because the "attorney-client relationship involves the highest degree of trust and confidence." Disciplinary Bd. of Haw. Sup. Ct. v. Kim, 59 Haw. 449, 453, 583 P.2d 333, 336 (1978); see also Morris v. Slappy, 461 U.S. 1, 24 (1983) (Brennan, J., concurring) ("[T]he attorney-client relationship . . . involves not just the casual assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client's life or liberty.").

Before ruling on a motion to substitute counsel based upon a breakdown in communication or an irreconcilable difference, a trial court must conduct a "penetrating and comprehensive inquiry" into the nature of the relationship between the defendant and counsel. Soares, 81 Hawai'i at 355, 916 P.2d at 1256 (citing Kane, 52 Haw. at 487-88, 479 P.2d at 209). This inquiry is not only required for the trial court to make an informed decision, but it also should seek to "ease the defendant's dissatisfaction, distrust, and concern." Adelzo-Gonzalez, 268 F.3d at 777 (quoting Garcia, 924 F.2d at 926).

Thus, when a motion to substitute counsel is based upon a breakdown in communication or an irreconcilable difference between counsel and client, the trial court "may need to evaluate the depth of any conflict between defendant and counsel, the extent of any breakdown in communication, how much time may be necessary for a new attorney to prepare, and any delay or inconvenience that may result from the substitution." Id.

For example, in this case, it is evident that the attorney-client relationship between Harter and Ickes was strained at the time Ickes sought to withdraw as Harter's counsel during the initial hearing. Ickes informed the court that Harter was not satisfied with her as counsel and that

49

Harter did not trust her; Ickes also emphasized her inability to communicate with Harter. Ickes told the court that she had only one scheduled meeting with Harter, and that otherwise, she spoke with her on the phone or when at court. The tension between Harter and Ickes became even more evident during the hearing the following morning when Harter explained that she was unable to get in touch with Ickes "since the very beginning." It also was noted that Harter was speaking with her "voice enraged" to Ickes outside the courtroom and that Ickes "was yelling" at Harter.

Given the evident tension and breakdown in communication between Ickes and Harter, it would have been appropriate for the circuit court to inquire into the following areas: (1) the reasons behind the communication breakdown between Ickes and Harter; (2) why Ickes had not met with Harter in over five months despite multiple requests by Harter to schedule other meetings; and (3) the basis for Harter's lack of trust and confidence in Ickes. Answers to these questions, which focus on the "status and quality of the attorney-client relationship," would have significantly aided the circuit court in "evaluat[ing] the depth" of any difference between Ickes and

Harter and the "extent of any breakdown in communication" between them.[25]  See Adelzo-Gonzalez, 268 F.3d at 778-79.

Here, the circuit court was overly focused on Ickes' ability to provide adequate representation, which is problematic because even with the most competent counsel, a serious breakdown in the attorney-client relationship can result in a deficient defense.  See id. at 778 (finding there was "too much emphasis on the appointed counsel's ability to provide adequate representation"); United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000) ("Even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense.").

Once the court has gained information regarding the breakdown in the attorney-client relationship through such questioning, the court may then more accurately evaluate the extent of the conflict and determine whether there is any action that may be taken in an effort to repair the attorney-client relationship.  Depending on the extent of the breakdown, the trial court, for example, may continue the motion for substitution of counsel to give the defense counsel and the defendant an opportunity to resolve their differences.  Where

---

[25] After sentencing was completed, the circuit court granted Ickes' motion to withdraw as counsel without Ickes stating any reason for the motion other than that Harter wished to appeal.  In the court's Order Appointing Counsel, the court found "good cause" for the appointment of substitute counsel.

the defendant is concerned about the lack of time to prepare for trial or conduct a sufficient investigation, the court may consider continuing the scheduled trial or other pending proceeding to allow the defendant and defense counsel additional time for preparation.

Although we believe the communication and trust issues that had arisen between Harter and Ickes clearly required the court to conduct further inquiry, we need not resolve whether the circuit court erred in finding otherwise.[26] Instead, we emphasize that a trial court must conduct a "penetrating and comprehensive inquiry" into the status and quality of the attorney-client relationship before ruling on a motion to substitute counsel based on a breakdown in communication or an

---

[26] The law is unsettled as to the result of a trial court declining to replace appointed counsel when there is a breakdown in communication. See LaFave et al., supra, § 11.4(b) ("Some courts have held that such an error establishes a Sixth Amendment violation and requires reversal of the conviction, absent a prosecution showing that the error was harmless. Others have held that a constitutional violation is established only if the defendant can show prejudice, under the ineffective-assistance standard . . . ."). In a prior decision, the ICA held that a trial court's denial of a motion to substitute counsel will not be overturned on appeal unless there is an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to effective assistance of counsel. State v. Soares, 81 Hawai'i 332, 355, 916 P.2d 1233, 1256 (App. 1996), overruled by State v. Janto, 92 Hawai'i 19, 986 P.2d 306 (1999). In using this standard, the ICA in Soares cited solely to this court's decision in State v. Torres, 54 Hawai'i 502, 510 P.2d 494 (1973), which held that a denial of a request for a continuance is not a per se denial of the right to counsel but the appellate court should scrupulously review the record to determine whether, under the circumstances, "there was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to effective assistance of counsel." 54 Hawai'i at 505, 510 P.2d at 496. This standard was subsequently cited by the ICA in State v. Kossman, 101 Hawai'i 112, 63 P.3d 420, 427 (App. 2001).

irreconcilable difference between the defendant and counsel.

Such an inquiry should elicit information regarding the extent

of the claimed breakdown in communication and the source and

depth of the claimed irreconcilable difference.  <u>Adelzo-

Gonzalez</u>, 268 F.3d at 778-79.  A trial court may consider the

delay or inconvenience that would result from a substitution of

counsel in addition to its consideration of the status and

quality of the attorney-client relationship.

**B.  Trial Court Duty to <u>Sua</u> <u>Sponte</u> Convene a Competency Hearing**

The second issue before the court is whether the

circuit court abused its discretion in failing to <u>sua</u> <u>sponte</u>

hold a hearing to determine Harter's competence to stand trial.

"It is a fundamental precept of the American system of justice

that a 'person whose mental condition is such that he or she

lacks the capacity to understand the nature and object of the

proceedings against him or her, to consult with counsel, and to

assist in preparing his or her defense may not be subjected to a

trial.'"  <u>Soares</u>, 81 Hawai'i at 345, 916 P.2d at 1246 (App. 1996)

(alterations omitted) (quoting <u>Drope v. Missouri</u>, 420 U.S. 162,

171, 95 S. Ct. 896, 903 (1975)).  Some have viewed this basic

principle "as a by-product of the ban against trials in

absentia" because "the mentally incompetent defendant, though

physically present in the courtroom, is in reality afforded no

53

opportunity to defend himself."  Drope, 420 U.S. at 171 (quoting Caleb Foote, A Comment on Pre-Trial Commitment of Criminal Defendants, 108 U. Pa. L. Rev. 832, 834 (1960)); Soares, 81 Hawai'i at 345, 916 P.2d at 1246.

HRS § 704-403 (1993) protects defendants accused of a criminal offense who lack the capacity to understand the proceedings against them or to assist in their defense.  An initial procedural mechanism for providing this protection is through evaluations of defendants by qualified medical examiners whenever a defendant relies on the defense of physical or mental disease, there is "reason to doubt the defendant's fitness," or there is "reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case."  HRS § 704-404(2) (Supp. 2012) (emphases added).

Although HRS § 704-404 provides that the court may suspend the proceedings and appoint an examiner or panel of examiners once one of the triggering events occurs, a trial court "is duty bound to sua sponte convene a . . . hearing if it itself has or is presented with rational basis for believing that the physical or mental defect of a defendant will become an issue on the question of fitness or responsibility."  State v. Castro, 93 Hawai'i 454, 462, 5 P.3d 444, 452 (App.) (Acoba, J., concurring), adopted by 93 Hawai'i 424, 426, 5 P.3d 414, 416

(2000). This duty required by HRS § 704-404 satisfies the procedural due process protections of article I, section 5 of the Hawai'i Constitution, and the fourteenth amendment to the United States Constitution.[27] Cf. Janto, 92 Hawai'i at 28, 986 P.2d at 315 (noting that when a trial court makes a fitness determination under HRS § 704–403 it must also meet procedural due process requirements).

Thus, when a trial court finds that there is "reason to doubt" a defendant's fitness or "reason to believe" that the defendant's mental or physical state will become an issue in the case, the court is required to suspend the proceedings and order an examination pursuant to HRS § 704-404. Castro, 93 Hawai'i at 426, 5 P.3d at 416. The court's "reason" "may come from the trial court's own observations, known facts, evidence presented, motions, affidavits, or any other reasonable or credible sources." Hobbs v. State, 359 S.W.3d 919, 924 (Tex. App. 2012). This may include evidence related to the defendant's history, the defendant's irrational and bizarre behavior, or the defendant's demeanor in court. See Castro, 93 Hawai'i at 427 n.2, 5 P.3d at 417 n.2 (finding "reason to doubt" the

---

[27] The fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution provide in relevant part that no person shall be deprived of "life, liberty, or property without due process of law."

defendant's fitness to proceed and "reason to believe" he was suffering from a disease, disorder, or defect that affected his ability to assist in his own defense based on the defendant's history and behavior); United States v. Marks, 530 F.3d 799, 814 (9th Cir. 2008) (noting that under the federal standard it is appropriate to consider "the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his [or her] competence").

During the proceedings in this case, Harter's recounting of past events and her current status was sometimes disjointed and bizarre. While describing her employment as a "dancer and a hostess" at a nightclub, Harter stated she was starting a "modeling agency" for charity "with them as [her] sponsor." She testified that the police officer who spoke to her outside of Club 939 was a "very short," "old man" who had "gray hair and a mustache" despite none of the officers testifying that such a person existed. Harter also testified she had "shrunk" after the incident, possibly because her muscles were "contracted instead of relaxed." Harter stated that being "touched" by the bouncer caused her "extreme" pain because she "hadn't been touched for about six months because [she] had just gotten out of [an] engagement" despite the fact

that she also said she was living with her "boyfriend" at the time.

Harter's mental state appeared to have substantially deteriorated by the time of the sentencing hearing. During the sentencing hearing, Ickes stated to the court that she thought Harter would respond well to "a probationary period and perhaps even with a special condition that she obtain and complete mental health treatment."

Further, Harter seemed delusional when speaking with the court. For example, she informed the court, "I used to have like $20 million, and I just lost my family and my fiancé. And during this, I had lost three businesses, I believe, because I had to stop and participate in the case." Harter claimed that her case was really a case of mistaken identity, and she asserted there was a statement by her boyfriend's dad, a Supreme Court justice, supporting her claim of mistaken identity. Harter claimed that she spoke to the FBI about her case and that she had gone to speak to her friend, the commander of Pearl Harbor.[28] Harter conveyed that she was terrified that something bad was going to happen to her throughout the proceedings because the district court judge at the first preliminary

---

[28] This may have been an attempt to explain how Harter got arrested on Hickam Air Force Base one month after her trial.

hearing had "screamed over everybody that was in the court and said, I'm going to fry you, da, da, da. I'm pushing it to the limit. You're going to be in jail for three years, da, da, da."

Given Harter's bizarre statements at sentencing, the record was clear that there was "reason to doubt" Harter's fitness during the sentencing proceedings, and the circuit court should have suspended the proceedings and appointed an examiner to evaluate Harter pursuant to HRS § 704-404. In Janto, this court held that the correct standard of review of a trial court's determination of fitness is abuse of discretion. See Janto, 92 Hawai'i at 28, 986 P.2d at 315. Similarly, an abuse of discretion standard should apply in reviewing a trial court's decision not to sua sponte order a fitness examination of a defendant under HRS § 704-404. Under the circumstances of this case, we conclude the circuit court abused its discretion in not ordering a fitness examination.[29]

In its Memorandum Opinion, the ICA noted that Harter's counsel never raised a mental impairment issue to the court. We recognize that "judges must depend to some extent on counsel" to

---

[29]  No pre-sentence report was required by the circuit court prior to sentencing. HRS § 706-601 allows courts the discretion to order pre-sentence reports for persons over the age of twenty-two years old who are convicted of misdemeanor offences. HRS § 706-601 (1) & (2) (Supp. 1997). Had the court requested a pre-sentence report, the court would have received a report on Harter's physical and mental condition, which likely would have more fully informed the court's sentencing decision. HRS § 706-602(1)(b) (Supp. 2012).

raise questions of fitness.  Castro, 93 Hawai'i at 462, 5 P.3d at 452 (Acoba, J., concurring) (quoting Drope, 420 U.S. at 176-77).  This is consistent with the expectation that defense counsel is responsible for raising his or her good faith doubts regarding the defendant's fitness.[30]

Nevertheless, any expectation that defense counsel will raise fitness issues is separate from the requirement that HRS § 704-404 imposes on trial courts.  Consequently, when the trial court's own observations or other indicators present the court with a "reason to doubt" the defendant's fitness, the court is required to order an examination irrespective of whether defense counsel raises the issue.  The duty placed on a trial court to sua sponte order an examination under HRS § 704-404 ensures the court's compliance with due process obligations and also serves the public interest.  "In the most egregious of circumstances, a mentally ill defendant who otherwise should have been subjected to examination and treatment may remain untreated in prison and upon his or her release, present a further or greater risk to public safety."  Castro, 93 Hawai'i at

---

[30]    Defense counsel should move for evaluation of the defendant's competence when he or she has a good faith doubt regarding defendant's competence to stand trial and "should make known to the court and the prosecutor those facts known to counsel which raise the good faith doubt of competence."  See ABA Standards for Criminal Justice, Mental Health, Mental Retardation, and Criminal Justice: General Professional Obligations, Standard 7.4.2(c) (1989).

462, 5 P.3d at 452 (citing HRS §§ 704-404 and 704-406(1)).  We therefore emphasize that, while HRS § 704-404 does not affirmatively require a trial court to investigate the competency of a defendant, it does require a court to consider indicators of a defendant's unfitness that are before the court.

### III.  Conclusion

For the foregoing reasons, the ICA's February 27, 2014 Judgment on Appeal and the circuit court's October 11, 2012 Judgment of Conviction and Sentence are vacated.  This case is remanded to the circuit court for further proceedings.

| | |
|---|---|
| Alen M. Kaneshiro<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| James M. Anderson<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

